**OPERATING AGREEMENT**
**OF**

**THE FREE USA, LLC**

a Wisconsin limited liability company

**Table of Contents**

**Article 1          General Provisions**
Section 1.1 Name
Section 1.2 Registered Office and Agent
          (a)    Initial Office and Agent
          (b)    Changes
          (c)    Filing on Change

**Article 2          Capital**
Section 2.1 Capital Contributions
Section 2.2 Additional Capital
          (a)    Contributions
          (b)    Borrowed Funds

**Article 3          Distributions**
Section 3.1 Tax Distributions
          (a)    Current Tax Distributions
          (b)    Additional Tax Distributions
          (c)    Net Tax Rate
Section 3.2 Current Distributions
Section 3.3 Liquidating Distribution

**Article 4          Allocation of Profits and Losses**
Section 4.1 Profits and Losses
Section 4.2 Tax Allocations
          (a)    Imputed Interest
          (b)    Capital Contributions
          (c)    Elections
          (d)    Income Tax Consequences

**Article 5          Managing Member**
Section 5.1 Qualification and Number
Section 5.2 Term
Section 5.3 Authority and Powers of Managing Member
          (a)    Authority
          (b)    Certificate of Authority
          (c)    No Other Representatives
Section 5.4 Restrictions on Authority of Managing Member
          (a)    Absolute Restrictions
          (b)    Restriction Without Consent
Section 5.5 Duties and Obligations of Managing Member
          (a)    Operations
          (b)    Time
          (c)    Tax Returns

Section 5.6 Effect of Withdrawal
Section 5.7 Limitation on Liability of Managing Member;
               Indemnification
Section 5.8 Expenses
Section 5.9 Actions by Managing Member

**Article 6          Actions by Members**
Section 6.1 Manner of Acting
Section 6.2 Determination of Affirmative Vote
Section 6.3 Voting
Section 6.4 Meetings
Section 6.5 Emergency Actions
Section 6.6 Records
Section 6.7 Restriction on Members

**Article 7          Transfer of Percentage Interests**
Section 7.1 General Restrictions on Transfers
Section 7.2 Permitted Transfers
                (a)   Notice of Transfer
                (b)   Affirmative Vote
                (c)   Transfer to Third Party
                (d)   Failure of Sale
Section 7.3 Involuntary Transfer
                (a)   Notice to Company
                (b)   Option to Purchase
                (c)   Failure to Exercise
Section 7.4 Voluntary Withdrawal
Section 7.5 Marital or Community Property and Divorce
                (a)   Marital or Community Property Rights
                (b)   Option to Purchase
                (c)   Member to Vote
Section 7.6 Effect of Transfers
                (a)   Transfers
                (b)   Dissociation
                (c)   Voting After Dissociation
Section 7.7 Time and Place of Closing
Section 7.8 Transfer and Payment of Purchase Price
Section 7.9 Subordination
Section 7.10       Specific Performance

**Article 8          Absolute Restrictions on Transfers**

**Article 9          Dissociation and Dissolution, Termination,
                and Liquidation of Company**
Section 9.1 Dissociation
                (a)   Events of Dissociation
                (b)   Effect of Dissociation
Section 9.2 Events Causing Dissolution
Section 9.3 Termination
Section 9.4 Liquidation
                (a)   Payment of Debts to Third Parties
                (b)   Payment of Debts to Members
                (c)   Payment of Distributions to Members
                (d)   Reserve
Section 9.5 Filing and Notice
Section 9.6 Distributions in Kind
Section 9.7 Limitation on Liability

**Article 10  Books and Records**
Section 10.1        Books and Records
Section 10.2        Company Funds
Section 10.3        Availability of Information

**Article 11  Reports**

**Article 12  Miscellaneous**
Section 12.1        Amendments to Operating Agreement
Section 12.2        Appointment of Managing Member as Attorney-in-Fact
Section 12.3        Binding Provisions
Section 12.4        Applicable Law
Section 12.5        Separability of Provisions
Section 12.6        Headings
Section 12.7        Interpretation
Section 12.8        Dispute Resolution
                    (a)    Confidentiality
                    (b)    Disputes
                    (c)    Costs
Section 12.9        Notice
Section 12.10       Counterparts

THIS OPERATING AGREEMENT is made and entered into as of __August 16th, __, 2021, by and between **Thomas Datwyler, Jr. and Kyle Swarts** (the "Members") of **THE FREE USA, LLC,** a Wisconsin limited liability company, for the purposes of providing the rights, obligations, and restrictions as set forth in this Operating Agreement with the force and effect of an operating agreement as provided for in the Wisconsin Limited Liability Company Law (the "WLLCL"). Any reference to "Member" in this Operating Agreement may import the plural if there is more than one member.

In consideration of the mutual promises made in this Operating Agreement, the parties agree to manage and operate the Company pursuant to this Operating Agreement as follows:

## ARTICLE 1
### General Provisions

**Section 1.1. Name.** The name of the Company is **THE FREE USA, LLC.**

**Section 1.2. Registered Office and Agent.**

**(a) Initial Office and Agent.** The principal place of business of the Company shall initially be **502 6th Street, Hudson, WI 54016** and the Company's Registered Agent Office shall initially be **901 S. Whitney Way, Madison WI 53711** and the Company's Registered Agent shall be **Incorp Services,Inc.**

**(b) Changes.** A subsequent Managing Member shall be the new Registered Agent and shall change the Registered Office, if appropriate, if the then-current Managing Member resigns or is removed or the Managing Member determines to make such an appointment or change.

**(c) Filing on Change.** Upon the appointment of a new Registered Agent or the change of the Registered Office, the Managing Member shall file or cause the filing of the document required by section 183.0105 of the WLLCL as appropriate to the circumstances.

## ARTICLE 2
### Capital

**Section 2.1. Capital Contributions.** The equity of the Company shall be divided into percentage interests (the "Percentage Interests") based on the relative capital contributions made by the Members, as set forth opposite their names below:

| Member | Contribution | Interest |
|---|---|---|
| Kyle Swarts | $_____ | 50 % |
| Thomas Datwyler | $_____ | 50 % |

1

**Section 2.2.  Additional Capital.**

(a)  **Contributions.**  The Members shall not be required to make any additional capital contributions or loans to the Company.  If the Managing Member determines that the Company capital is or is soon likely to become insufficient for the conduct of the Company's business, he or she shall attempt to borrow funds from Members or third parties on such terms and conditions as are reasonable under the circumstances.

(b)  **Borrowed Funds.**  Each Member shall be severally liable for his or her pro rata share (based on the Member's Percentage Interest) of (1) any indebtedness of the Company for which recourse may be had by the lender against any Member as a result of a guarantee or similar undertaking and (2) any indebtedness of the Company owed to any Member, regardless of the origins of the indebtedness.  If any Member (1) is compelled to make a payment on any indebtedness of the Company in excess of the Member's pro rata share or (2) is unable to collect the entire amount owed to the Member by the Company under any indebtedness to him or her, the other Members shall reimburse the Member entitled to reimbursement upon demand based on their respective pro rata shares.  The provisions of this Section 2.2(b) may only be enforced by the Member entitled to reimbursement under this Section 2.2(b).

## ARTICLE 3
### Distributions

**Section 3.1.  Tax Distributions.**

(a)  **Current Tax Distributions.**  To the extent permitted by law and consistent with the Company's obligations to its creditors as determined by the Managing Member, and unless otherwise determined by Affirmative Vote (determined pursuant to Section 6.2 below), the Company shall make distributions ("Tax Distributions") on or before January 15, April 15, June 15, and September 15 (the "Tax Distribution Dates") of any given Fiscal Period (as defined in Article 11 below).  The aggregate amount of the Tax Distribution made with respect to any given Tax Distribution Date shall be the product of (1) the Company's estimated federal taxable income, calculated by the Managing Member under the provisions of the Internal Revenue Code (the "Code") as though the Company were an individual all of whose gross income and expenditures were attributable to a trade or business regularly carried on, for the portion of the Fiscal Period commencing on the first day of the calendar month that includes the immediately previous Tax Distribution Date and ending on the last day of the calendar month immediately preceding the Tax Distribution Date, multiplied by (2) the Net Tax Rate (as defined in Section 3.1(c) below).  The aggregate amount of each Tax Distribution shall be distributed to the Members in proportion to their Percentage Interests.

(b)  **Additional Tax Distributions.**  In the event any income tax return of the Company, as a result of an audit or otherwise, reflects items of income, gain, loss, or deduction that are different from the amounts estimated pursuant to Section 3.1(a) above with respect to the Fiscal Period of the return in a manner that results in additional income or gain of the Company being allocated to Members, an additional Tax Distribution shall be made under the principles of Section 3.1(a) above, except that (1) the last day of the calendar

2

month in which the adjustment occurs shall be treated as a Tax Distribution Date, and (2) the amount of the additional income or gain shall be treated as the Company's federal taxable income.

        **(c)** **Net Tax Rate.** For purposes of this Section 3.1, Net Tax Rate means:

        **(i)** with respect to current Tax Distributions made pursuant to Section 3.1(a) above, the net tax rate shall be adjusted from time to time by the Managing Member to reflect the highest marginal rates of income taxes imposed on resident individuals of Wisconsin, assuming state and local income taxes are fully deductible; or

        **(ii)** with respect to additional Tax Distributions made pursuant to Section 3.1(b) above, such rate as is determined by the Managing Member, taking into consideration the taxable year to which the additional Tax Distribution relates, the jurisdictions to which income taxes may be owing with respect to the income or gain under consideration, and any interest or penalties to be paid with respect to the income or gain under consideration.

        **Section 3.2. Current Distributions.** At such times and in such form as determined by Affirmative Vote, current distributions shall be made to the Members in proportion to their Percentage Interests.

        **Section 3.3. Liquidating Distribution.** In the event the Company is liquidated pursuant to Article 9 below, the assets to be distributed pursuant to Section 9.4(c) below shall be distributed to the Members in proportion to their Percentage Interests.

**ARTICLE 4**
**Allocation of Profits and Losses**

        **Section 4.1. Profits and Losses.** Except as provided below in this Article 4, items of income, gain, loss, or deduction of the Company shall be allocated among the Members in proportion to their Percentage Interests. Such items shall be determined on a daily, monthly, or other basis, as determined by the Managing Member using any permissible method under section 706 of the Code and the Treasury Regulations under that section.

        **Section 4.2. Tax Allocations.** The following special allocations shall be made in the following order:

        **(a)** **Imputed Interest.** To the extent the Company has interest income or deductions with respect to any obligation of or to a Member pursuant to section 483, sections 1271B1288, or section 7872 of the Code, such interest income or deductions shall be specially allocated to the Member to whom the obligation relates.

        **(b)** **Capital Contributions.** In accordance with section 704(c) of the Code and the Treasury Regulations under that section, income, gain, loss, or deduction with respect to any capital contribution shall, solely for tax purposes, be allocated among the Members so as to take account of any variation between the adjusted basis of the property to the Company for federal income tax

purposes and its value.

(c) **Elections.**  Any elections or other decisions relating to such allocations shall be made by the Managing Member in any manner that reasonably reflects the purpose and intent of this Operating Agreement.  Allocations pursuant to this Section 4.2 are solely for purposes of federal, state, and local taxes and shall not affect, or in any way be taken into account in computing, any capital account, share of income, gain, loss, or deduction, or distribution pursuant to any provision of this Operating Agreement.

(d) **Income Tax Consequences.**  The Members are aware of the income tax consequences of the allocations made by this Article 4 and agree to be bound by the provisions of this Article 4 in reporting their shares of income and loss for income tax purposes.


## ARTICLE 5
## Managing Member

Section 5.1.  **Qualification and Number.**  The Managing Member shall be a Member chosen by Affirmative Vote.  The number of Managing Members shall be one except as otherwise provided by Affirmative Vote and if more than one then each shall have the powers, duties, responsibilities and authority granted under law and herein.  If there is more than one managing member, then reference to "Managing Member" in this Article and throughout the Operating Agreement shall import the plural.

Section 5.2.  **Term.**  Unless otherwise provided by Affirmative Vote, a person shall cease to be a Managing Member upon the earliest to occur of any of the following:  (1) the Member's voluntary resignation effective as of the prospective date provided in a written notice from the Member to the Company; (2) the Managing Member's removal as such by Affirmative Vote; or (3) the Member's Dissociation (as defined in Section 9.1(a) below) from the Company for any reason.

Section 5.3.  **Authority and Powers of Managing Member.**

(a) **Authority.**  Except to the extent this Agreement requires an action to be taken with an Affirmative Vote, the Managing Member for, in the name of, on behalf of, and at the expense of the Company, is authorized to do on the Company's behalf all ministerial acts to carry out the Company's business in its ordinary course, including, but not limited to, the right to:

(i)  buy, sell, and lease Company property that does not represent a material part of the Company's aggregate property;

(ii)  pursuant to a budget approved by Affirmative Vote, borrow money and procure temporary, permanent, conventional, or other financing or refinancings on such terms and conditions, at such rates of interest, and from such parties as are approved, and, if security is required for the loan, to mortgage or subject to another security interest the Company assets;

(iii) insure the Company's activities and property;

**(iv)** pursuant to a budget approved by Affirmative Vote, enter into contracts or agreements with persons for routine matters of operation, and pay from the Company's funds the consideration required under such contracts or agreements;

**(v)** pay out of the Company's funds all fees and expenses incurred in the organization of the Company, as well as all operating expenses;

**(vi)** perform all other acts or activities customary or incident to the routine and day-to-day operation of a business such as that conducted by the Company;

**(vii)** establish and maintain books and records for the Company;

**(viii)** appoint a new Registered Agent or change the Registered Office pursuant to Section 1.2 above; and

**(ix)** retain attorneys, accountants, and other professionals in the course of the performance of his or her duties and the exercise of his or her powers.

**(b)   Certificate of Authority.**  Any person dealing with the Company or the Managing Member may rely on a certificate signed by the Managing Member as to:

**(i)**   the identity of the Members and Managing Member;

**(ii)**   the existence or non-existence of any fact or facts that constitute a condition precedent to acts by the Managing Member or any other matter germane to the Company's affairs;

**(iii)** the persons who are authorized to execute and deliver any instrument or document on the Company's behalf; or

**(iv)** any act or failure to act by the Company or the Members or as to any other matter whatsoever involving the Company or any Member.

**(c)   No Other Representatives.**   Only the Managing Member has the right, power, and authority to execute documents on behalf of and in the name of the Company except as actually authorized by Affirmative Vote, and no person shall be obligated to inquire into the authority of the Managing Member to bind the Company.

**Section 5.4.   Restrictions on Authority of Managing Member.**

**(a)   Absolute Restrictions.**   The Managing Member shall not have the authority to:

**(i)**   do any act that is in contravention of applicable law or this Operating Agreement or that would make it impossible to carry on the ordinary business of the Company;

**(ii)**   possess Company property, or assign rights in specific Company property, for other than a Company purpose; or

(iii) perform any act that would subject the Members to liability in any jurisdiction except as expressly provided in this Operating Agreement.

(b) **Restriction Without Consent.** Without an Affirmative Vote, the Managing Member shall not have the authority to:

(i) sell or otherwise dispose of a material part of the Company's assets;

(ii) borrow money or procure financing or refinancings, or mortgage or subject to another security interest any material portion of the Company's assets;

(iii) enter into contracts or agreements with persons for routine matters of operation, and pay from the Company's funds the consideration required under such contracts or agreements;

(iv) make capital improvements to or otherwise rehabilitate the Company's properties;

(v) issue additional Percentage Interests;

(vi) confess a judgment against the Company; or

(vii) make any changes or amendments to the Company's Articles of Organization.

**Section 5.5. Duties and Obligations of Managing Member.**

(a) **Operations.** The Managing Member shall take all action that may be necessary or appropriate (1) for the Company's day-to-day operation and business in accordance with the provisions of this Operating Agreement and applicable laws and regulations, and (2) for the continuation of the Company's valid existence as a limited liability company under the WLLCL.

(b) **Time.** The Managing Member shall devote to the Company such time as the Managing Member deems necessary for the proper performance of his or her duties under this Operating Agreement, but the Managing Member shall not be required to devote his or her full time or any specific amount of time to the performance of those duties.

(c) **Tax Returns.** The Managing Member shall prepare or cause to be prepared and shall file on or before the due date (or any extension of the due date) any federal, state, or local tax returns required to be filed by the Company. The Managing Member shall cause the Company to pay any taxes payable by the Company out of Company funds. The Managing Member shall serve as the Company's "tax matters partner" as defined for purposes of the Code.

**Section 5.6. Effect of Withdrawal.** If a Managing Member ceases to be a Managing Member for any reason, the remaining Managing Member or Managing Members, if any, shall continue to act as such unaffected by the withdrawal. If the Company at any time lacks a Managing Member, the Members shall conduct the Company's business and affairs by Affirmative Vote unless and until the Members appoint a substitute Managing Member by Affirmative Vote. The lack of a Managing

Member shall not cause a dissolution or termination of the Company.

**Section 5.7.  Limitation on Liability of Managing Member; Indemnification.**
No Managing Member shall be liable, responsible, or accountable in damages or otherwise to the Members for any act or omission pursuant to the authority granted to the Managing Member by this Operating Agreement if the Managing Member acted in good faith and in a manner he or she reasonably believed to be within the scope of the authority granted to him or her by this Operating Agreement and in the best interests, or not opposed to the best interests, of the Company, provided that the Managing Member shall not be relieved of liability in respect of any claim, issue, or matter as to which the Managing Member shall have been finally adjudicated to have violated section 183.0402 of the WLLCL.  Subject to this limitation in the case of any such judgment of liability, the Company shall indemnify and allow expenses to the Managing Member to the fullest extent permitted or required by section 183.0403 of the WLLCL.

**Section 5.8.  Expenses.**  All reasonable and customary out-of-pocket expenses incurred by the Managing Member in connection with the Company's business shall be paid by the Company or be reimbursed to the Managing Member by the Company.

**Section 5.9.  Actions by Managing Member.**  Management decisions by the Managing Member are made in his or her role as proxy of the other Members and not solely in his or her role as a Member.  Acts by the Managing Member involving persons other than Members are taken in his or her role as an agent of the Company.


# ARTICLE 6
## Actions by Members

**Section 6.1.  Manner of Acting.**  Any authority not specifically delegated to the Managing Member acting unilaterally pursuant to Article 5 above shall be reserved to the Members acting by an Affirmative Vote.  Actions and decisions requiring an Affirmative Vote may be authorized or made either by vote of the Members taken at a meeting of the Members or by unanimous written consent of the Members without a meeting.  Any act taken by Affirmative Vote shall be implemented by the person or persons so authorized.

**Section 6.2.  Determination of Affirmative Vote.**  An Affirmative Vote requires either the consent at a meeting by Members holding Percentage Interests totaling at least 51% of the Percentage Interests entitled to vote, or a written consent signed by all Members entitled to vote.  No person other than a Member may challenge an act taken by the Company based on the failure to obtain the requisite Affirmative Vote, and any act taken by the Company with respect to a third party having no actual knowledge of such failure shall be binding against the Company.

**Section 6.3.  Voting.**  Each Member attending a meeting shall vote his or her entire Percentage Interest or abstain as to any given issue.  Notwithstanding the foregoing, any Member abstaining from voting on a given issue will be deemed to have voted his or her Percentage Interest in the same manner and in the same proportions as the Members not abstaining on the issue.  Any Member having a personal stake, other than the economic stake inuring to the Member solely as a

result of holding his or her Percentage Interest, in the outcome of an issue, including but not limited to a personal stake as a Transferor (as defined in Section 7.2(a) below), shall abstain from voting on the issue unless all Members have such a personal stake.

**Section 6.4. Meetings.**  Any Member may call a meeting to consider approval of an action or decision under any provision of this Operating Agreement by delivering to each other Member notice of the time and purpose of the meeting at least 24 hours before the meeting.  A Member may waive the requirement of notice of a meeting either by attending the meeting or executing a written waiver before or after the meeting.  Any such meeting shall be held during the Company's normal business hours at its principal place of business unless all of the other Members consent in writing or by their attendance at the meeting to its being held at another location or time.

**Section 6.5. Emergency Actions.**  Notwithstanding any other provisions of this Article 6, if Members who could authorize an action or decision at a duly called meeting reasonably determine, in writing, that the Company is facing a significant business emergency that requires immediate action, those Members may, without complying with generally applicable procedures for meetings or actions by unanimous consent, authorize any action or decision that they deem reasonably necessary to allow the Company to benefit from a significant opportunity or to protect the Company from significant loss or damage, provided that they make reasonable efforts under the circumstances to contact and consult all Members concerning the action or decision and the reason why the action or decision must be made without observing generally applicable procedures.

**Section 6.6. Records.**  The Company shall keep written records of all actions taken and votes made by the Members, which records shall be kept and maintained by the Managing Member.  Any Member alleging that the requisite Affirmative Vote was not duly given has the burden of proof as to the invalidity of that Vote.  Written records kept pursuant to this Section 6.6 of a meeting at which an Affirmative Vote was given as to an issue shall be prima facie proof of the validity of the Vote, if notice of the issue to be discussed at the meeting was duly given or waived pursuant to Section 6.4 above.

**Section 6.7. Restriction on Members.**  No Member, in his or her capacity as such, shall have the authority to act for the Company in any matter.  This Section 6.7 constitutes a restriction on the Members' management rights and duties to the extent such rights and duties have been delegated to the Managing Member (in his or her role as such) as proxy of the Members.


### ARTICLE 7
### Transfer of Percentage Interests

**Section 7.1. General Restrictions on Transfers.**  A Member may not sell, give, assign, bequeath, pledge, or otherwise encumber, divest, dispose of, or transfer ownership or control of all, any part, or any interest in, whether voluntarily or by operation of law, either inter vivos or upon death ("Transfer") the Member's Percentage Interest to any person (a "Transferee") other than the Company or another Member, except in accordance with the terms of this Operating Agreement.  Any Transfer, attempted Transfer, or purported Transfer in violation of the terms and conditions of this Operating Agreement shall be null and void.

**Section 7.2.  Permitted Transfers.**

      **(a)  Notice of Transfer.**  Except in the case of an Involuntary Transfer pursuant to <u>Section 7.3</u> below, any Member who proposes to Transfer his or her Percentage Interest (a "Transferor") shall send written notice to the Company and the other Members prior to any proposed Transfer stating the portion of the Percentage Interest proposed to be Transferred; the name and address of the prospective Transferee; the date on which the Transfer is to occur (which date shall not be less than 120 days after the date of the Notice of Transfer); and the sale price, the terms of payment, and the other material terms and conditions of the proposed Transfer (a "Notice of Transfer").  The Managing Member shall deliver a copy of each Notice of Transfer to each other Member promptly upon receipt of the Notice, which when delivered shall constitute valid notice under <u>Section 6.6</u> above of the proposed Transfer and the Member's rights with respect to the proposed Transfer.  The Notice of Transfer shall constitute a request by the Transferor for an Affirmative Vote to the proposed Transfer.

      **(b)  Affirmative Vote.**  Each Member receiving the Notice of Transfer must, within 30 days of delivery of the Notice to the Company, refuse to consent to the proposed Transfer, or the Member will be conclusively deemed to have consented to the proposed Transfer.  The Company must, within 35 days of delivery of the Notice of Transfer to the Company, inform the Transferor that the Members refused to provide an Affirmative Vote to the proposed Transfer, or the Members will be conclusively presumed to have given an Affirmative Vote to the proposed Transfer.  For purposes of this <u>Section 7.2</u>, the definition of <u>Affirmative Vote</u> in <u>Section 6.2</u> above shall be revised to require the consent of all Members other than the Transferor.

      **(c)  Transfer to Third Party.**  If the Transferor receives or is deemed to receive an Affirmative Vote to the proposed Transfer, the Transferor may Transfer the Percentage Interest pursuant to this <u>Section 7.2(c)</u>, at which time the Transfer will be effective and the Transferee will be considered a Member.

      **(i)**  The Transferor may Transfer all (but not less than all) of the Percentage Interest identified in the Notice of Transfer to the third party designated in the Notice of Transfer at the same price and on the same terms of payment specified in the Notice of Transfer, provided that the Transfer is made within 120 days after the date of the Notice of Transfer.

      **(ii)**  The Transferee must, as part of the closing of the Transfer, sign a counterpart to this Operating Agreement, agreeing for the benefit of the other Members to be bound by this Operating Agreement to the same extent as if the Transferee had been an original party to the Operating Agreement as a Member.

      **(iii)**  The Transferee must, as part the closing of the Transfer, take all actions and execute all instruments required by the Company in order for the Transfer to comply with any applicable federal or state laws and regulations relating to the Transfer of Percentage Interests or with this Operating Agreement.

      **(iv)**  The spouse, if any, of the Transferee must, as part of

the closing of the Transfer, execute a spousal consent and acknowledgment in form satisfactory to the Company.

(d) **Failure of Sale.** If the Percentage Interest described in the Notice of Transfer is not Transferred within the applicable periods and in accordance with the foregoing provisions of this Section 7.2, the Percentage Interest shall again be subject to the restrictions of this Article 7.

**Section 7.3. Involuntary Transfer.** An Involuntary Transfer to a person other than the Company or another Member will be effective only after the applicable provisions of this Section 7.3 have been complied with. The creditor, receiver, trust or trustee, estate, beneficiary, or other person to whom a Percentage Interest is Transferred by Involuntary Transfer (the "Involuntary Transferee") will have only the rights provided in this Section 7.3. Involuntary Transfer means any Transfer of a Percentage Interest by operation of law or in any transaction, proceeding, or action, including a Transfer resulting from the dissociation of a Member, by or in which a Member would, but for the provisions of this Section 7.3, be involuntarily deprived or divested of any right, title, or interest in or to the Member's Percentage Interest, including, without limitation, (1) a Transfer on death or bankruptcy, (2) any foreclosure of a security interest in the Percentage Interest, (3) any seizure under levy of attachment or execution, or (4) any Transfer to a state or to a public office or agency pursuant to any statute pertaining to escheat or abandoned property or forfeiture.

(a) **Notice to Company.** The Transferor and the Involuntary Transferee shall each immediately deliver a written notice to the Company describing the event giving rise to the Involuntary Transfer; the date on which the event occurred; the reason or reasons for the Involuntary Transfer; the name, address, and capacity of the Involuntary Transferee; and the Percentage Interest involved (a "Notice of Involuntary Transfer"). The Notice of Involuntary Transfer shall constitute an offer (the "Offer") to sell the Percentage Interest identified in the Notice for an amount equal to the book value of the Percentage Interest, calculated as of the last day of the calendar month immediately preceding the date of the Involuntary Transfer, which shall be payable pursuant to the terms of payment set forth in the applicable provisions of Section 7.8 below. Book value shall be the net equity of the Company, as reflected in the accounting, and not the tax, records of the Company, allocated proportionately among the Percentage Interests at the effective time of determination.

(b) **Option to Purchase.** Within the 90-day period commencing on the date of the receipt of the Notice of Involuntary Transfer, the Company shall either reject or accept the Offer by written notice to the Involuntary Transferee during the 90-day period.

(c) **Failure to Exercise.** If the Company does not accept the Offer or fails through no fault of the Transferor or Involuntary Transferee to close the Transfer within the applicable time period pursuant to Section 7.3(b) above, the Involuntary Transfer shall become effective. The Percentage Interest Transferred to an Involuntary Transferee pursuant to this Section 7.3(c) shall be considered in all respects a Percentage Interest held by the Member from whom it was Transferred for purposes of this Operating Agreement other than Articles 3 and 4 above, the nonmanagement provisions of which will apply to the Involuntary Transferee as though he or she held the Percentage Interest. Except as otherwise

provided in this Operating Agreement, any actions that a Member takes or would be entitled to take with respect to a Percentage Interest, including without limitation votes, consents, offers, sales, purchases, options, or other deeds taken pursuant to this Operating Agreement, shall be taken by the Member for the Involuntary Transferee with respect to the Percentage Interest held by the Involuntary Transferee. This Section 7.3(c) shall constitute an irrevocable and absolute proxy and power of attorney (the proxy and power being coupled with an interest) granted by each Involuntary Transferee to the Member to (1) take such actions on behalf of the Involuntary Transferee without any further deed than the taking of the action by the Member, and (2) sign any document or instrument evidencing such action for or on behalf of the Involuntary Transferee relating to the Percentage Interest held by the Involuntary Transferee.

**Section 7.4. Voluntary Withdrawal.** Each Member has the power to voluntarily withdraw from the Company by giving notice to the Company at least 60 and no more than 120 days before the effective date of the withdrawal. On the effective date of the withdrawal, the Company shall redeem all of the Percentage Interest held by the Member and any Involuntary Transferee to whom the Member has transferred a Percentage Interest. The redemption price for the Percentage Interest shall be an amount equal to the fair market value of the Percentage Interest, calculated by agreed valuation of all members or if they cannot agree then by a mutually acceptable appraiser. If the parties cannot agree on such an appraiser then the withdrawing member shall select an appraiser and the remaining members shall select an appraiser who shall appraise the fair market value and an average of the two appraisals shall be the value of the business for purposes of this calculation as of the last day of the calendar month immediately preceding the date of the redemption, which shall be payable pursuant to the terms of payment set forth in the applicable provisions of Section 7.8 below.

**Section 7.5. Marital or Community Property and Divorce.**

**(a) Marital or Community Property Rights.** For purposes of this Operating Agreement, any reference to a Percentage Interest shall include all interests in the Percentage Interest now or hereafter acquired by the spouse of a Member or Transferee as a result of (1) community or marital property during marriage, (2) a property division or other award or Transfer upon dissolution of marriage, (3) community or marital property, deferred marital property, or an augmented marital property estate, or (4) any allowance or assignment of property under provisions of any applicable community or marital property law. The creation of an interest in a Percentage Interest by operation of any applicable community or marital property law shall not be deemed to be a Transfer so long as the Percentage Interest in which an interest is created continues to satisfy the following two conditions:

**(i)** the Percentage Interest is registered in the name of the Member or Transferee; and

**(ii)** the Percentage Interest is controlled by the Member or Transferee.

**(b) Option to Purchase.** If the conditions set forth in either of Section 7.5(a)(i) or 7.5(a)(ii) above cease to be satisfied for any reason (including, without limitation, the death of the spouse of the Member or Transferee or the dissolution of marriage), the resulting Transfer shall be considered

an Involuntary Transfer subject to the provisions of Section 7.3 above.

   **(c)  Member to Vote.**  Each Member shall vote with respect to all matters that come before the Members until the Transfer, if any, of the Percentage Interest to the Member's spouse pursuant to Section 7.5(b) above.  By signing a spousal consent and acknowledgment, if a spouse is married to a Member at the time he or she becomes a Member, or by becoming the spouse of a Member, the spouse, without further act or deed, grants to the Member an irrevocable and absolute proxy and power of attorney (the proxy and power being coupled with an interest) to (1) take such actions on the spouse's behalf without any further deed than the taking of the action by the Member with respect to the Percentage Interest otherwise held by the Member, and (2) sign any document or instrument evidencing the action for or on behalf of the spouse relating to the Percentage Interest.

   **Section 7.6.  Effect of Transfers.**

   **(a)  Transfers.**  Until a Transfer is effective and the Transferee is considered a Member, if ever, pursuant to the applicable provisions of this Article 7, the Transferor shall be treated as the holder of the subject Percentage Interest, except to the extent provided in this Article 7.  When a Transfer is effective and the Transferee becomes a Member, if ever, pursuant to the applicable provisions of this Article 7, the Company's records shall be amended to reflect the Transferee as a Member.

   **(b)  Dissociation.**  Upon the dissociation of a Member, the Percentage Interest that is or has been Transferred to Involuntary Transferees by that Member, including Transfers resulting from the dissociation, shall not be taken into consideration under this Agreement, except with respect to the nonmanagement provisions of Articles 3 and 4 above, unless and until the Transferee of the Percentage Interest has been admitted as a Member pursuant to this Article 7.

   **(c)  Voting After Dissociation.**  If, as a result of Section 7.6(b) above, there are either no Members or no Percentage Interests with respect to which a Member is entitled to vote, then all Involuntary Transferees otherwise holding Percentage Interests shall be entitled to vote with respect to the Percentage Interests.  Notwithstanding any other provision of this Article 7, each Transferee shall be considered a member of the Company solely for purposes of determining compliance with section 183.0201 of the WLLCL.  Nothing in the preceding sentence shall be construed to give a Transferee any rights that are not otherwise provided in this Operating Agreement.

   **Section 7.7.  Time and Place of Closing.**  Except as otherwise agreed by the Company, the closing of any Transfer pursuant to this Article 7 shall occur at the Company's principal office on such day as the Transferee shall select pursuant to the provisions of this Article 7.  The Transferee shall notify the Transferor and the Company in writing of the exact date and time of closing at least 10 days before the closing date.

   **Section 7.8.  Transfer and Payment of Purchase Price.**  At the closing, the Transferor shall deliver the Percentage Interest that is subject to the Transfer free and clear of any liens, security interests, encumbrances, charges, or other restrictions (other than those created pursuant to this Operating Agreement), together with all such instruments or documents of conveyance as shall be reason-

12

ably required in connection with the Transfer. If not otherwise agreed, the purchase or redemption price for the Percentage Interest shall be evidenced by a promissory note providing for a minimum of ten percent (10%) down at closing and the balance of the price payable in three (3) equal annual payments of principal and interest thereon commencing on the first anniversary of the closing date. Whenever payment of the purchase price is to be made in such installments, the purchaser's obligation for the unpaid balance of the purchase price shall bear interest payable with payments of principal at the applicable federal rate for instruments of like maturity, as defined for purposes of the Code.

**Section 7.9. Subordination.** Any obligation of the Company evidenced by a promissory note delivered pursuant to Section 7.8 above may be subordinated to the Company's obligations to any lender. Each holder of a promissory note shall enter into, and, upon request, from time to time confirm in writing the existence of, an agreement that sets forth the extent and manner of the subordination in such form as any lender of the Company reasonably requests; provided, however, that if there is no default in the Company's performance of its payment or other obligations to the lender, the promissory note holder shall be entitled to receive regularly scheduled payments of principal and interest pursuant to the promissory note.

**Section 7.10. Specific Performance.** The parties declare that it may be impossible to measure in money the damages that will accrue to any party by reason of a failure to perform any of the obligations under this Article 7, and the parties agree that this Article 7 shall be specifically enforced. Therefore, if any Member or Transferee institutes any action or proceeding to enforce the provisions of this Article 7, any person, including the Company, against whom the action or proceeding is brought waives the claim or defense that the party has or may have an adequate remedy at law. The person shall not urge in any such action or proceeding the claim or defense that a remedy at law exists, and the person shall consent to the remedy of specific performance of this Operating Agreement. Notwithstanding the foregoing, no party may specifically enforce the obligation not to voluntarily withdraw in breach of this Agreement.


## ARTICLE 8
## Absolute Restrictions on Transfers

No Transfer of any Percentage Interest may be made if, in the opinion of the Company's legal counsel, the transfer or assignment (1) will result in the Company's being treated as an association for federal income tax purposes or (2) will violate any applicable federal or state securities laws. Before making any Transfer of any Percentage Interest, the Transferor must notify the Company in writing and the Managing Member shall, if he or she believes there is a material risk of violating this Article 8, obtain an opinion from the Company's legal counsel confirming whether the proposed Transfer will cause such a change in tax status or violation of securities laws. Legal fees shall be the Transferor's responsibility.


## ARTICLE 9
## Dissociation and

13

**Dissolution, Termination, and Liquidation of Company**

**Section 9.1.  Dissociation.**

(a)  **Events of Dissociation.**  A Member shall cease to be a Member ("Dissociate") upon the occurrence of any of the following events:

(i)  the Member makes a general assignment of the Member's assets, including his or her Percentage Interest, for the benefit of creditors;

(ii)  the Member files a voluntary petition in bankruptcy;

(iii)  the Member becomes the subject of an order for relief under the federal bankruptcy laws;

(iv)  the Member files a petition or answer seeking for the Member any reorganization, arrangement, composition, readjustment, liquidation, dissolution, or similar relief under any statute, law, or regulation;

(v)  the Member files an answer or other pleading admitting or failing to contest the material allegations of a petition filed against the Member in any proceeding described in Clause (iv) above;

(vi)  the Member seeks, consents to, or acquiesces in the appointment of a trustee, receiver, or liquidator of the Member or of all or any substantial part of the Member's properties, including the Member's Percentage Interest;

(vii)  the expiration of 120 days after the commencement of any involuntary proceeding against the Member seeking reorganization, arrangement, composition, readjustment, liquidation, dissolution, or similar relief under any statute, law, or regulation, if the proceeding has not been dismissed;

(viii)  the expiration of 120 days after the appointment without the Member's consent or acquiescence of a trustee, receiver, or liquidator of the Member or of all or any substantial part of the Member's properties, including the Member's Percentage Interest, if the appointment is not vacated or stayed, or at the expiration of 120 days after the expiration of any stay, if the appointment is not vacated;

(ix)  if the Member is an individual, the Member's death or the entry of an order by a court of competent jurisdiction adjudicating the Member incompetent to manage the Member's person or estate;

(x)  if the Member is a trust or is acting as a Member by virtue of being a trustee of a trust, the termination of the trust, but not merely the substitution of a new trustee;

(xi)  if the Member is a corporation, partnership, or separate limited liability company, the dissolution and commencement of winding up of the Member;

(xii)  the Transfer, pursuant to Article 7 above, by the Member of all of the Member's Percentage Interest; or

14

**(xiii)** the Member ceases to contract with the Company to provide professional services to its customers.

**(b)    Effect of Dissociation.**  The Dissociation of a Member shall not result in the Transfer of the Member's Percentage Interest except as provided in <u>Article 7</u> above.

**Section 9.2.    Events Causing Dissolution.**  The Company shall be dissolved upon the happening of any of the following:  (1) the sale or other disposition of all or substantially all the Company's assets; (2) the election by a unanimous Affirmative Vote to dissolve the Company; or (3) the Dissociation of any Member, unless, within 90 days of the date on which the Company receives written notice of the Dissociation, the Members vote to continue the Company by Affirmative Vote.

**Section 9.3.    Termination.**  Dissolution of the Company shall be effective on the date on which the Dissolution Event occurs, but the Company shall not terminate until articles of dissolution have been duly filed under the WLLCL, the Company's affairs have been wound up, and the Company's assets have been distributed as provided in <u>Section 9.4</u> below.  Notwithstanding the dissolution of the Company, this Operating Agreement shall continue to govern the Company's business and the Members' affairs until the Company is terminated and liquidated.

**Section 9.4.   Liquidation.**  Upon expiration of the 90-day period described in Section 9.2 above, the Members shall appoint by Affirmative Vote a liquidator of the Company, who may but need not be a Member or Managing Member.   The liquidator shall have the same authority granted to the Managing Member in Sections 5.3 and 5.4 above, and he or she shall proceed with the winding up and liquidation of the Company by applying and distributing its assets as follows:

       **(a)   Payment of Debts to Third Parties.**   The assets shall first be applied to the payment of the Company's liabilities (other than any loans or advances that may have been made to the Company by a Member) and the liquidation expenses.   A reasonable time shall be allowed for the orderly liquidation of the Company's assets and the discharge of liabilities to creditors so as to enable the liquidator to minimize any losses resulting from the liquidation.

       **(b)   Payment of Debts to Members.**   The remaining assets shall next be applied to the repayment of any loans or advances (but not any Capital Contribution) made by the Members to the Company, in proportion to the relative amounts lent or advanced.

       **(c)   Payment of Distributions to Members.**   The remaining assets shall be distributed to the Members pursuant to Section 3.3 above.

       **(d)   Reserve.**   Notwithstanding the provisions of Sections 9.4(a), 9.4(b), and 9.4(c) above, the liquidator may retain such amount as the liquidator reasonably deems necessary as a Reserve for any contingent liabilities or obligations of the Company, which funds shall, after the passage of a reasonable period of time, be distributed in accordance with the provisions of this Article 9.

**Section 9.5.   Filing and Notice.**  The liquidator shall promptly, upon his or her appointment, execute and file on the Company's behalf articles of dissolution as provided in section 183.0906 of the WLLCL.   The liquidator shall also notify the Company's known claimants as provided in section 183.0907 of the WLLCL and publish a notice of the Company's dissolution as provided in section 183.0908 of the WLLCL, except as otherwise determined by the liquidator with an Affirmative Vote.

**Section 9.6.   Distributions in Kind.**   If any Company assets are to be distributed in kind, the assets shall be distributed on the basis of their Value, and any Member entitled to an interest in the assets shall receive the interest as a tenant-in-common with all other Members so entitled.

**Section 9.7.   Limitation on Liability.**   Each holder of a Percentage Interest shall look solely to the Company's assets for all distributions from the Company and the return of his or her Capital Contribution to the Company and shall have no recourse (upon dissolution or otherwise) against any other Members or any of their affiliates.

## ARTICLE 10
## Books and Records

**Section 10.1.   Books and Records.**  The Company's books and records shall be maintained at the Company's principal office or at any other place designated by the Managing Member and shall be available for examination by any Member or his

or her duly authorized representative(s) at any reasonable time.

   **Section 10.2.  Company Funds.**  The Company's funds may be deposited in such banking institutions as the Managing Member determines, and withdrawals shall be made only in the regular course of the Company's business on such signature or signatures as the Members determine by Affirmative Vote.  All deposits and other funds not needed in the operation of the business may be invested in certificates of deposit, short-term money market instruments, government securities, money market funds, or similar investments as the Managing Member determines.

   **Section 10.3.  Availability of Information.**  The Company shall keep at its principal office and place of business, and each Member shall have the right to inspect and copy, all of the following:  (1) a current list of the full name and last-known business address of each Member or former Member set forth in alphabetical order, the date on which each Member or former Member became a Member and the period of his or her Membership, and the date on which any former Member ceased to be a Member; (2) a copy of the Articles and all amendments to the Articles; (3) copies of the Company's federal, state, and local income tax returns and financial statements, if any, for its four most recent years; (4) copies of this Operating Agreement and any effective written amendments to this Operating Agreement; and (5) any records kept pursuant to this Operating Agreement, including without limitation those described in Section 6.6 above. Each Member shall have the right to obtain from the Company from time to time on reasonable demand, at the Member's cost and expense, copies of any such information.


## ARTICLE 11
### Reports

   Within 60 days after the end of each Fiscal Period, the Managing Member shall send to each person who was a Member at any time during the Fiscal Period then ended (1) a balance sheet as of the end of the Period, (2) statements of income, Members' equity, changes in financial position, and a cash flow statement for the Fiscal Period then ended, and (3) such tax information as is necessary or appropriate for the preparation by the Members of their individual federal and Wisconsin income tax returns.  In addition, the Managing Member shall provide reports on a more frequent basis to a requesting Member to the extent reasonably requested by the Member.  Fiscal Period means any 12-month period ending on December 31 or any portion of such period for which the Company is required to allocate income, gain, loss, or deduction for federal income tax purposes.


## ARTICLE 12
### Miscellaneous

   **Section 12.1.   Amendments to Operating Agreement.**  No amendment or modification of this Operating Agreement shall be valid unless in writing and signed by all of the Members.  Unless otherwise provided in such an amendment or modification, this Operating Agreement shall be considered to be amended only to the minimal extent necessary to give effect to this Operating Agreement, and the other terms and conditions of this Operating Agreement shall continue to apply with full force and effect.

   **Section 12.2.  Appointment of Managing Member as Attorney-in-Fact.**  The

Company constitutes and appoints the Managing Member as its true and lawful attorney-in-fact with full power and authority in its name, place, and stead to execute, acknowledge, deliver, swear to, file, and record at the appropriate public offices such documents as may be necessary or appropriate to carry out the provisions of this Operating Agreement, including, but not limited to, all certificates and other instruments (including counterparts of this Operating Agreement), and any amendment of this Operating Agreement, that the Managing Member deems appropriate to qualify or continue the Company as a limited liability company in the jurisdictions in which the Company conducts business or in which such qualification or continuation is, in the Managing Member's opinion, necessary to protect the Members' limited liability.

**Section 12.3.  Binding Provisions.**  The agreements and covenants contained in this Operating Agreement inure solely to the benefit of the parties to this Operating Agreement.  Except in an action brought by, but not on behalf of, a Member, no provision of this Operating Agreement is specifically enforceable, and no provision of this Operating Agreement shall be construed to create any third-party beneficiary claims, including, without limitation, those of Transferees. Subject to the foregoing, the agreements and covenants contained in this Operating Agreement shall be binding on the heirs, executors, administrators, personal representatives, successors, and assigns of the respective parties to this Operating Agreement.

**Section 12.4.  Applicable Law.**  This Operating Agreement shall be governed by and construed in accordance with the laws of the state of Wisconsin without regard to its choice of law provisions.

**Section 12.5.  Separability of Provisions**.  Each provision of this Operating Agreement shall be considered separable, and if for any reason any provision or provisions of this Operating Agreement are determined to be invalid and contrary to any existing or future law, the invalidity shall not affect or impair the operation of those portions of this Operating Agreement that are valid.

**Section 12.6.  Headings.**  Section headings are for descriptive purposes only and shall not control or alter the meaning of this Operating Agreement as set forth in the text.

**Section 12.7.  Interpretation.**  When the context in which words are used in this Operating Agreement indicates that such is the intent, words in the singular shall include the plural, and vice versa, and pronouns in the masculine shall include the feminine and neuter, and vice versa.

**Section 12.8.  Dispute Resolution.**

**(a)  Confidentiality.**  This Operating Agreement, the Company's business and affairs, the Company's books and records, and any information relating to the foregoing are confidential and private.  Each person holding a Percentage Interest agrees to maintain the confidentiality and privacy of, and not to disclose, any such information.

**(b)  Disputes.**  Any dispute arising with respect to this Operating Agreement, its making or validity, its interpretation, or its breach shall be settled by arbitration in **St. Croix** County, Wisconsin, pursuant to the then-obtaining rules of the American Arbitration Association.  Such arbitration shall

be the sole and exclusive remedy for such disputes except as otherwise provided in this Operating Agreement.  Any award rendered shall be final and conclusive upon the parties, and a judgment may be entered in any court having jurisdiction.

        **(c)   Costs.**   If any proceedings are instituted by any person with respect to any dispute arising under or to collect any benefits due under this Operating Agreement, the prevailing party in the proceedings shall be entitled to recover the costs of the proceedings and reasonable attorney fees from the other party; provided, however, that the Company may offset any amounts owed by it to another person by reason of this <u>Section 12.8(c)</u> against any funds or other property that are in the Company's possession and that are owed by the Company to, or owned by, that other person.

        **Section 12.9.   Notice.**   Any notice required or permitted to be given pursuant to this Operating Agreement shall be valid only if in writing and upon actual receipt by the intended recipient of the notice.  Any person required to give notice pursuant to this Operating Agreement shall have the burden of proving the validity of the notice.

        **Section 12.10.   Counterparts.**   This Operating Agreement may be executed in counterparts, all of which shall constitute the same agreement.

        IN WITNESS WHEREOF, the undersigned have executed this Operating Agreement on     August 16th    , 2021

_____
Thomas Datwyler

_____
Kyle Swarts

### Spousal Consent and Acknowledgment

I acknowledge that I have read the foregoing Operating Agreement and that I understand its contents.  I am aware that by its provisions my spouse agrees to sell all his Percentage Interest of The Free USA, LLC held by him on this date, or hereafter acquired, upon the occurrence of certain events.  I am further aware that included in such a sale shall be any interest I have in the Percentage Interest (including without limitation any right or interest by operation of the Wisconsin Marital Property Act, chapter 766 of the Wisconsin Statutes, or by operation of any other law) and the interest of any of my heirs, legatees, or other transferees.  I consent to such a sale, approve the provisions of the Operating Agreement, agree to sell any interest I may have in any such Percentage Interest as required by the Operating Agreement, agree that the Percentage Interest and my interest in it are subject to the provisions of the Operating Agreement, and direct the personal representative of my estate to promptly comply with all of the provisions of the Operating Agreement, including without limitation, <u>Article 7</u>.  I further agree that I will take no action at any time to hinder the operation of the Operating Agreement as to the Percentage Interest or any interest that I or my transferees have in it.


Date:  August 16th, 2021 Spouse:  _____

**Spousal Consent and Acknowledgment**

I acknowledge that I have read the foregoing Operating Agreement and that I understand its contents.  I am aware that by its provisions my spouse agrees to sell all his Percentage Interest of The Free USA, LLC held by him on this date, or hereafter acquired, upon the occurrence of certain events.  I am further aware that included in such a sale shall be any interest I have in the Percentage Interest (including without limitation any right or interest by operation of the Wisconsin Marital Property Act, chapter 766 of the Wisconsin Statutes, or by operation of any other law) and the interest of any of my heirs, legatees, or other transferees.  I consent to such a sale, approve the provisions of the Operating Agreement, agree to sell any interest I may have in any such Percentage Interest as required by the Operating Agreement, agree that the Percentage Interest and my interest in it are subject to the provisions of the Operating Agreement, and direct the personal representative of my estate to promptly comply with all of the provisions of the Operating Agreement, including without limitation, Article 7.  I further agree that I will take no action at any time to hinder the operation of the Operating Agreement as to the Percentage Interest or any interest that I or my transferees have in it.


Date:  August 16th, 2021     Spouse:  _____

**Property Schedule**

<u>[Describe property contributed
and liabilities, if any, assumed]</u>

Thomas Datwyler

Kyle Swarts