**United States District Court**
**Western District of Wisconsin**

_____

| | | |
|---|---|---|
| Same Day Processing, Inc.; | ) | Civil No. 23-731 |
| 44 North Lists, LLC; | ) | |
| Right Donor Builders PDM, LLC; and | ) | |
| The Free USA, LLC | ) | **DEFENDANT'S** |
| | ) | **AMENDED ANSWER** |
| Plaintiffs, | ) | **COUNTERCLAIMS    &** |
| | ) | **THIRD-PARTY CLAIMS.** |
| vs. | ) | |
| | ) | **(Jury Trial Demanded)** |
| Gabriel Franck | ) | |
| Defendant | ) | |
| Third Party Plaintiff | ) | |
| vs. | ) | |
| | ) | |
| Thomas Datwyler | ) | |
| Third Party | ) | |
| Defendant | ) | |

_____ )

## ANSWER

Defendant Gabriel Franck, for his Amended Answer to Plaintiffs' Amended Complaint (hereinafter "Complaint"), states and alleges as follows:

1. Deny each and every paragraph, matter and allegation contained in the Complaint, except as hereinafter qualified, admitted or explained.

2. Admit the allegations contained in the following paragraphs: 10 – 13, 46, 50 – 53.

3. Upon reasonable investigation, Defendants are without sufficient information to admit or deny the allegations contained in the following paragraphs: 4 - 9, 14 – 20, 30, 31, 34, 40, 43.

4. With respect to Paragraph 1, Defendant is without sufficient information to respond to what gave rise to Plaintiff's bringing the action and specifically denies: (1) ever being

employed by Plaintiff Same Day Processing, Inc. ("SDP"), or (2) retaining access of and transferring SDP's trade secrets and confidential information.

5. With respect to Paragraph 3, Defendant is without sufficient information to know what, if anything SDP discovered on October 2, 2023. Defendant specifically denies: (1) improperly accessing, downloading, and retaining SDP's trade secrets and confidential information, (2) that Defendant attempted to sell that information to third parties and (3) that Defendant held himself out as a representative of SDP or suggesting to those third parties that Defendant's actions were authorized by SDP.

6. With respect to Paragraph 22, Defendant admits being assigned an email address for The Free USA. Defendant specifically denies all other claims and/or allegations contained in Paragraph 22.

7. With Respect to Paragraph 27, Defendant is without sufficient information to affirm or deny whether Plaintiff, The Free USA, maintains certain third-party data which The Free USA has authorization to possess, access, and use for specified purposes or whether Defendant had access to such third-party data. Defendant specifically denies that Defendant was employed by The Free USA.

8. With respect to paragraph 37 Defendant admits having an email address for 44 Plaintiff 44 North and an email address for Plaintiff SDP. Defendant denies all other claims and/or allegations contained in Paragraph 37.

9. With Respect to Paragraph 38, Defendant is without sufficient information to affirm or deny whether the 44 North Data is owned by RDB and licensed to 44 North or whether SDP and SDP employees performing work on behalf of 44 North are authorized to access

that data. Defendant denies all other claims and/or allegations contained in Paragraph 38.

10.     With respect to Paragraph 47, Defendant admits to mistakenly filing for one week of unemployment. Defendant denies that application was denied solely because he was terminated for misconduct.

## DEFENSES

1. Plaintiff's Complaint, in whole or in part, may have failed to state a claim upon which relief can be granted.

2. Plaintiff's fail to describe the subject matter of the trade secret, confidential and/or proprietary data with sufficient particularity.

3. Granting Plaintiffs any damages would result in unjust enrichment.

## AFFIRMATIVE DEFENSES

1. Defendant affirmatively alleges that Plaintiff's damages, if any, were caused by Plaintiff's own contributory fault, negligence and carelessness.

2. Defendant affirmatively alleges that Plaintiff's Complaint, in whole or in part, may fail due to lack of privity.

3. Defendant affirmatively alleges that Plaintiff's Complaint, in whole or in part, may be barred due to the statute of frauds.

4. Defendant affirmatively alleges that Plaintiff's Complaint, in whole or in part, may be barred due to a breach by one of the Plaintiffs.

5. Defendant affirmatively alleges that, to the extent Plaintiffs incurred damages, one or more of the Plaintiffs failed to mitigate those damages.

6.  Defendant affirmatively alleges that Plaintiff's damages, if any, may have been caused by the acts or omissions of other parties over whom Defendant had no control or right of control.

7.  Defendant affirmatively alleges that Plaintiff's damages, if any, were caused by Plaintiff's own failure or inability to provide acceptable products, service and support to its customers.

8.  Defendant affirmatively alleges that Plaintiff's damages, if any, are offset by money owed Defendant by Plaintiff 44 North Lists, LLC, Plaintiff Right Donor Builders PDM, LLC and/or Plaintiff The Free USA, LLC.

9.  Defendant affirmatively alleges that Plaintiff's claims may be barred in whole or in part by the doctrines of unclean hands, estoppel or waiver.

10. Defendant affirmatively alleges that Plaintiff's claims may be barred in whole or in part because Plaintiffs may have provided any and/or all alleged confidential and/or proprietary information to Defendant without requesting, demanding, or informing that such information was proprietary, trade secret, or otherwise subject to confidentiality or other restrictions.

11. Defendant affirmatively alleges that Plaintiff's claims may be barred in whole or in part because Plaintiff's predecessor and/or successor in interest may have provided any and all alleged confidential and/or proprietary information to Defendant without requesting, demanding, or informing that such information was proprietary, trade secret, or otherwise subject to confidentiality or other restrictions.

12. Defendant specifically reserves the right to allege such other and further affirmative defenses as may be properly interposed pending discovery in this matter.

## COUNTER & THIRD PARTY CLAIMS

Defendant, Gabriel Franck, as and for his Counterclaim against Plaintiffs Same Day Processing, Inc., 44 North Lists, LLC, Right Donor Builders PDM, LLC and The Free USA, LLC and Third-Party Claim against Thomas Datwyler, states and alleges as follows:

1.      Third Party Defendant Thomas Datwyler ("Datwyler") is an individual with a residence in Hudson, Wisconsin.

2.      Upon information and belief, Datwyler owns an interest in Plaintiff Same Day Processing, Inc.

3.      Upon information and belief, Datwyler owns an interest in Plaintiff 44 North Lists, LLC.

4.      Upon information and belief, Datwyler owns an interest in Plaintiff Right Donor Builders PDM, LLC.

5.      Upon information and belief, Datwyler owns an interest in Plaintiff The Free USA, LLC.

6.      Defendant Gabriel Franck ("Franck") graduated from the University of Wisconsin-Madison, in 2020 with a degree in Political Science.  After graduation, while he searched for a job, Franck lived in his parents' home located in Hudson, Wisconsin.

7.      Datwyler resides across the street and a few houses down from Franck's parents in Hudson, Wisconsin.

8.      Datwyler's father, Thomas Datwyler, Sr. and Franck's father, Todd Franck, grew up in the Hudson, Wisconsin area and attended the same K-12 schools.

9.      In or about March 2021, Datwyler and Franck became friendly.  Over the course of several months, Datwyler invited Franck numerous times to join Datwyler for exercise

together at the gym located in Datwyler's private residence. During that time exercising, Franck and Datwyler got to know each other. Franck informed Datwyler that he was a recent graduate with a degree in political science. Datwyler claimed he, and some of his businesses, were active in the political field. Datwyler further claimed to have several contacts in the political field and offered to send Franck's resume to those contacts to help Franck attain a job.

10.     Due to the familiarity between the Franck and Datwyler fathers, the neighborly relationship enjoyed between the Franck and Datwyler families and the conversations between Datwyler and Franck, Franck viewed Datwyler as a trusted mentor.

11.     On or about June 22, 2021, Datwyler suggested to Franck that Franck join Datwyler in one or more of Datwyler's business ventures. Franck offered to work with Datwyler if needed; however, at that time, no projects were undertaken by Franck with, or on behalf of, Datwyler and Franck continued his search for a job. Datwyler continued to reach out to Franck numerous times to further gain Franck's trust and discuss business opportunities.

12.     In or about August 2021, Franck accepted a position with Bell Bank in Woodbury, Minnesota. That position paid a base salary of $50,000.00 per year with opportunities for bonuses along with benefits such as retirement account matching and health insurance.

13.     Franck informed Datwyler of his new position at Bell Bank. Datwyler inquired of the compensation Franck was to receive in that position. After Franck described that compensation, Datwyler offered to pay Franck $5,000.00 per month to join Datwyler's political fundraising businesses. Franck rejected that offer because he was not interested in making a move from Bell Bank for comparable compensation. Franck made clear that

he would not leave his position at Bell Bank unless the offer included compensation greater than what Bell Bank paid.

14.     On or about August 25, 2021, Datwyler offered a business opportunity to Franck. Datwyler claimed to have ownership interest in a business involved in political fundraising which turned out to be Plaintiff, The Free USA, LLC.  The day-to-day functions of that business was run by an individual residing in California named Kyle Swarts ("Swarts") who, Datwyler claimed, was not performing due to "laziness".  Datwyler told Franck that Datwyler wanted to replace Swarts with Franck.  Datwyler further claimed that, despite his lack of performance, Swarts earned between $30,000.00 and $60,000.00 per month. Datwyler then showed Franck documentation that stated the business generated more than $2,000,000.00 in a single year.  Datwyler represented to Franck that, if Franck accepted Datwyler's offer, once Franck replaced Swarts, Franck would earn between $30,000.00 and $60,000.00 per month.  Datwyler represented to Franck that, if Franck accepted Datwyler's offer, Franck would earn a minimum of $200,000.00 per year even while Swarts remained part of the business.  Franck agreed to consider that offer.

15.     On or about September 24, 2021, Franck began to learn how the political fundraising businesses raised funds via electronic mail.

16.     In or about October 2021, Franck and Datwyler again discussed how they would co-own political fundraising businesses including the ownership structure for the business and Francks' compensation outside of profit sharing.  Datwyler offered Franck 50% ownership in any business in which Datwyler and Franck were the only owners.  Datwyler further offered to pay Franck a minimum monthly amount of $2,000.00 until profits were consistently distributed to reach the $200,000.00 per year minimum profit sharing

Datwyler previously represented Franck would earn. Franck accepted both offers and the parties agreed that those would be the baseline terms to structure any business relationship they entered together.

17.    For his 50% interest in each business owned with Franck, Datwyler was to: provide business experience, create and maintain proper legal structures for each business, provide raw data that each business would process and turn into lists of potential donors, manage the finances of each business and he was to invest some operating capital as needed into each business. Other than those items, Datwyler would be hands off – providing no day-to-day effort on behalf of the business.

18.    For his 50% interest in each business owned with Datwyler, Franck was to make the businesses owned with Datwyler Francks' primary professional focus. In doing so, Franck was to provide, among other things, his time used to process the raw data, establish accounts with third party venders to both further process the raw data and enable the business to send numerous texts and/or e-mails at one time, track success and failures of the businesses' efforts and use the same to update the data and oversee the short- and long-term goals and operations of each business.

19.    Datwyler knew Franck would need to resign his job at Bell Bank so that Franck could make these new businesses his primary professional focus and that Francks' resignation would result in Franck losing the $50,000.00 per year salary, opportunities for bonuses and all benefits, including but not limited to, retirement account matching and health insurance.

20.     On or about November 22, 2021, Datwyler instructed Franck to complete an IRS W9 form in order to receive $2,000.00 per month from Plaintiff The Free USA, LLC ("Free USA").  Franck complied and provided Datwyler a fully executed IRS W9 form.

21.     Before Franck resigned his job at Bell Bank, to ensure he could perform the tasks assigned, Franck sought to learn more about how these types of political fundraising businesses operated.  Datwyler informed Franck that he would send Franck the information needed for Franck to understand what he would need to accomplish.

22.     On or about November 30, 2021, Datwyler, from Datwyler's unsecured electronic mail account, tcdatwyler@gmail.com ("Datwyler's Gmail"), sent a set of raw data to Franck's unsecured, generic, gabe.franck1@gmail.com, electronic mail account ("Franck's Gmail").  The raw data was attached to that electronic mail message in three files: (1) MasterDataPull.xslx, (2) MasterList1.xlsx, and (3) MasterList2.xlsx.  None of those files were encrypted, nor password protected.

23.     On or about November 30, 2021, via unsecured electronic mail sent to Franck's Gmail from Swarts' unsecured electronic mail account, tcdatwyler@gmail.com, Swarts provided Franck access to a Google work folder labeled "The Free USA".  Neither that electronic mail nor the Google folder were encrypted, nor password protected.   All documents relating to The Free USA were kept in that The Free USA Google work folder, including, without limitation, the raw data and the contact lists derived from the same.

24.     After working with the raw data and the information and documentation contained in The Free USA Google work folder, Franck was confident he could perform the duties required by the agreement he reached with Datwyler regarding the political fundraising businesses.

25.     In or about November, 2021, Franck notified Datwyler he was ready to move forward with their new businesses per the terms agreed to in October, 2021.  Datwyler suggested, instead of starting a new business, that Franck join The Free USA, LLC.  Due to Swarts owning a portion of The Free USA, LLC, Datwyler offered Franck 25% ownership in The Free USA, LLC with all other terms remaining as previously agreed between Datwyler and Franck.  Datwyler again represented that the 25% ownership interest in The Free USA, LLC would pay Franck a minimum of $200,000.00 per year via profit sharing.  Datwyler further offered to increase Franck's ownership to 50% once Swarts was no longer a part of The Free USA, LLC.  Datwyler confirmed to Franck that Datwyler would ensure Franck received 50% ownership in any business in which Datwyler and Franck were the only owners.   Franck accepted Datwyler's offers.

26.     The Free USA, LLC was engaged by representatives of various politicians to send messages, created by those representatives, that sought donations to prospective political donors via electronic mail.

27.     Relying on Datwyler's promises to ensure Franck received 25% ownership in The Free USA, LLC which would pay Franck a minimum of $200,000.00 per year via profit sharing, that Franck's ownership interest would increase to 50% when Swarts was no longer a part of The Free USA, that Datwyler would ensure Franck received 50% ownership in any other business in which Datwyler and Franck were the only owners and that Datwyler would pay Franck a monthly amount of $2,000.00 until profits were consistently distributed to reach the $200,000.00 per year minimum profit sharing Datwyler had promised Franck would earn, Franck resigned his job at Bell Bank.  In doing so, Franck forwent, among other things, $50,000.00 per year salary, opportunities for

bonuses and all benefits, including but not limited to, retirement account matching and health insurance.

28.     On or about December 2, 2021, Franck notified Datwyler that Franck resigned his position at Bell Bank and was starting his fulltime efforts on behalf of their businesses. Datwyler responded "[y]ou the man! Let's Fucking go".

29.     On or about January 10th, 2022, Datwyler notified Franck that Swarts refused or failed to return Datwyler's calls.  Datwyler informed Franck that Franck needed to take over all the work done by Swarts because Swarts was no longer reliable.

30.     On or about March 3, 2022, after taking on a larger workload than originally agreed, Franck expressed concern to Datwyler that Franck had not received any of the profits from their businesses and that $2,000.00 was not enough to justify working long hours seven days a week.  Datwyler claimed business had slowed and was no longer profitable. Datwyler asked Franck to hang with him a little longer because, as soon as Swarts was out, they would be making money.  Trusting his mentor, Franck continued his efforts on behalf of Datwyler and Franck's business.

31.     In or about March 2022, Franck attended educational meetings to learn the laws and regulations related to campaign financing. Among other things, Franck learned how to appropriately seek donations via text messaging.   Franck then established the accounts necessary for Datwyler and Franck's businesses to send donation requests via text messaging.

32.     On or about April 20, 2022, Datwyler notified Franck that Datwyler had another check for Franck.  Among other things, Datwyler stated "[g]oing to keep paying you until we turn a profit on this…".

33.     On or about June 8, 2022, Datwyler, from Datwyler's Gmail, sent Franck another set of raw data to Franck's Gmail.  The raw data was attached to that electronic mail message in a single .csv file. That file was neither encrypted, nor password protected.

34.     On or about December 5, 2022, Swarts locked Franck out from the vendor accounts used by The Free USA, LLC to conduct its business.  Swarts failed or refused to respond to Franck's attempts to communicate.

35.     Upon information and belief, Swarts failed or refused to respond to Datwyler's attempt to communicate and never returned any of the documents, data, information, etc. owned by The Free USA, LLC.

36.     Due to Swarts cutting Datwyler and Franck off from all The Free USA, LLC accounts, including, among other things, The Free USA, LLC Google work folder and third-party vendor accounts used to process the raw data and send out mass text and electronic mail messages, Franck and Datwyler had to start from scratch.

37.     On or about January 2, 2023, Datwyler notified Franck that they needed to set up a company "for the two of us" to operate their business through.  Datwyler instructed Franck to establish the third-party vendor accounts necessary for their new business to conduct business in the same manner as The Free USA, LLC conducted its business.

38.     From the beginning of his efforts toward Franck's businesses owned with Datwyler, Franck worked solely from home.  On or about January 2, 2023, to provide Franck an opportunity to get out of Franck's home from time to time, Datwyler offered Franck use of space at the location of another of Datwyler's businesses, Plaintiff Same Day Processing, Inc.  Franck accepted that offer until Franck realized there was no specific space set aside for Franck to work.  Of note, the last space made available for Franck at that location,

previously a residential home that Datwyler used as a commercial office, was a landing that was part of the stairs to the basement of that home. After that, Franck worked primarily from his home while still going into Same Day Processing Inc.'s office periodically – often to ensure Franck had an opportunity to talk with Datwyler.

39.     On or about January 2, 2023, after Franck again raised concerns over the lack of profits, Datwyler again stated the businesses were not profitable and suggested Franck attempt to take on another job. Datwyler offered Franck referrals. One to a business called "Prosper Group" as well as a position with a business called "Axiom".

40.     Upon information and belief, Axiom has a financial and/or ownership interest in Plaintiff Same Day Processing, Inc.

41.     Datwyler and Franck agreed to call the new company, The Eagle News Network. With no other owners besides Datwyler and Franck, Datwyler was to ensure Franck received a 50% ownership interest. Datwyler stated he would get the paperwork drawn up to establish The Eagle News Network LLC.

42.     On or about January 6, 2023, Datwyler provided Franck with a Delaware Certificate of Formation for a limited liability company named "The Eagle News Network LLC" and instructed Franck to sign the same. Franck signed and returned the fully executed Certificate of Formation to Datwyler.

43.     Franck relied upon Datwyler's promise to create and maintain proper legal structures for each business when believing Datwyler would ensure that fully executed Certificate of Formation was properly filed and all other documents necessary to properly establish that business, per the previously agreed upon terms, were in place.

44.     The Eagle News Network LLC was engaged by representatives of various politicians to send messages, created by those representatives, that sought donations to prospective political donors primarily via electronic mail.  Some such messages were also sent by Eagle News Network LLC using text messaging.

45.     To avoid donor fatigue and to avoid electronic mail servers from flagging their mass mailings as "spam" or "junk", Datwyler and Franck utilized additional businesses and/or business names that did the same or similar work as The Eagle News Network LLC. Plaintiff, Right Donor Builders PDM, LLC, was one such business.  Most of those businesses operated with their own, distinct, web site and set of e-mail addresses.

46.     Datwyler represented to Franck that Datwyler would funnel the income from the businesses referenced in Paragraph 45 into The Eagle News Network LLC so that such income would be distributed pursuant to The Eagle News Network LLCs' business ownership structure.

47.     On or about January 10, 2023, Datwyler, from Datwyler's Gmail, sent Franck another set of raw data to Franck's Gmail.  The raw data was attached to that electronic mail message in a single file named "1.6.23.xslx". That file was neither encrypted, nor password protected.

48.     On or about January 16, 2023, Franck sent Datwyler an outline for a business, different from the current political fundraising businesses in which they were currently engaged, that was subsequently named "Synch".  Datwyler agreed to pursue that new business with Franck.   The parties understood that Datwyler and his brother Timothy Datwyler would own 50% of Synch for providing capital, Franck would own 25% of Synch for his time and efforts designing and building Synch and 25% of ownership was set aside

for potential investors. Franck accepted those terms and began investing time and effort in Synch.

49.     On or about June 20, 2023, Franck and Datwyler, along with Brian Chatwin and Ryan Datwyler, created Plaintiff 44 North Lists, LLC. Datwyler offered Franck 25% ownership in that business in exchange for Franck providing the same services he provides The Eagle News Network, LLC. Because Datwyler desired to keep certain funds and opportunities from Brian Chatwin, Datwyler further offered to ensure Franck received 50% of profits from the accounts known only to Datwyler and Franck. Franck accepted Datwyler's offers and began investing time and energy in 44 North Lists, LLC.

50.     Still receiving much less money than Datwyler previously described, Franck continued to express his concern and frustration to Datwyler regarding Datwyler's claim that their businesses lacked profits. In or about August, 2023, Franck was copied on an electronic mail that indicated the businesses in which he was an owner, and entitled to profits, were, contrary to Datwyler's claims, very profitable. Franck made multiple attempts to discuss this information with Datwyler. Datwyler refused or failed to communicate with Franck regarding the same.

51.     On or about August 30, 2023, Franck sent Datwyler's brother, Timothy Datwyler – also an owner in Plaintiff 44North Lists, LLC, an electronic mail explaining the situation. Franck informed Timothy Datwyler that Franck found information indicating the businesses, including 44 North Lists, LLC, were, contrary to Datwyler's assertions, profitable. Franck asserted his belief that he, and his fellow owners, were owed an explanation from Datwyler regarding the financial status of the businesses.

52.    On or about August 31, 2023, the day after Franck sent Datwyler's brother electronic mail questioning Datwyler's claims regarding lack of profits, Datwyler notified Franck that Franck was cut out of all businesses.

53.    Neither the Plaintiffs nor Datwyler ever paid Franck any profits owed Franck per his ownership interests or other agreements.

54.    Neither the Plaintiffs nor Datwyler ever paid the full compensation owed Franck per the agreements between the parties.

55.    Upon information and belief, Datwyler took some or all the profits owed to Franck for his own use.

56.    Upon information and belief, Plaintiff, The Free USA, LLC took some or all the profits owed to Franck for its own use.

57.    Upon information and belief, Plaintiff, 44 North Lists, LLC, took some or all the profits owed to Franck for its own use.

58.    Upon information and belief, Plaintiff, Right Donor Builders PDM, LLC took some or all the profits owed to Franck for its own use.

59.    Upon information and belief, Datwyler controlled all financial aspects of the Plaintiffs, The Eagle News Network, LLC and all other businesses referenced directly and indirectly herein.

60.    Upon information and belief, Datwyler controlled the official business records of the Plaintiffs, The Eagle News Network, LLC and all other businesses referenced directly and indirectly herein.

61.     Upon information and belief, Datwyler blurred the corporate lines and shifted assets between and amongst the businesses in which he had an ownership interest and/or over which he had control.

62.     Despite claims by Plaintiffs that Defendant did not show up to the office for 16 days prior to August 31, 2023, as described in Paragraph 38 herein, it was commonplace that Franck did not go to the office daily as he often worked from home.  At the outset of their arrangement, both Datwyler and Franck worked full time from their respective homes.  Datwyler eventually purchased a property in downtown Hudson, Wisconsin for Plaintiff Same Day Processing, Inc., and casually offered Franck space to periodically use to dget out of the house.  However, it was never part of any agreement between Franck and Datwyler, or any of the Plaintiffs, that Franck would spend any amount of time in that space.  During that period, as had been since the start of their business relationship, Franck remained in constant contact with Datwyler, and Plaintiffs, via texting, phone calls and electronic mail.  For example, Franck sent more than 40 electronic mail messages to Datwyler from Franck's Gmail account alone during that 16 day period (note, per Paragraph 45 herein, the parties used multiple different electronic mail addresses).  During that period, Datwyler sent Franck, either individually or via a group, 39 electronic mail messages – none of which suggest Datwyler believed Franck working from home was anything but normal.

63.     Stunned by the sudden default and perceived betrayal by Datwyler, Franck frantically sought options to continue his career and earn money.  Franck ignorantly filed for unemployment compensation.  After researching and understanding his situation did not qualify for unemployment compensation, Franck ceased all efforts to receive the

same. Franck also contemplated his options regarding the businesses he created in partnership with Datwyler. Franck did not have sufficient information regarding those businesses to know whether he should pursue his ownership interests or unpaid profits.

64.    In or about September, 2023, Franck started a new business, Piera Media LLC which initially focused on marketing for law firms.

65.    On or about September 5, 2023, Targeted Victory, a representative of various politicians seeking donations, contacted Franck via Franck's Gmail asking Franck to provide invoices for money owed by Targeted Victory to The Eagle News Network, LLC for previously completed mass electronic mail fundraising efforts. Unsure how to properly proceed, Franck did not respond to those messages at that time.

66.    On or about September 11, 2023, Targeted Victory again contacted Franck, via Franck's Gmail, seeking the status of the invoices requested on September 5, 2023. Believing his 50% ownership of The Eagle News Network, LLC permitted him to act as he believed fair, Franck responded to that message with an electronic mail that included a link to an invoice for the amount owed to be paid to Piera Media LLC. Targeted Victory never paid that invoice nor has Franck ever received any payment or compensation from Targeted Victory.

67.    On or about September 19, 2023, in an attempt to understand the profitability of businesses such as The Eagle News Network so as to determine whether to pursue legal action to recoup profits owed Franck and/or determine whether Franck should add political fundraising to Piera's offerings, Franck responded again to the September 11, 2023 electronic mail sent by Targeted Victory. In that message: (1) Franck explained to Targeted Victory that, going forward, Franck would be doing business as Piera Media

LLC; (2) Franck proffered a different method of utilizing the services Franck previously provided Targeted Victory through The Eagle News Network LLC; and (3) Franck inquired about Targeted Victory's interest in the services then currently offered by Piera Media LLC. Targeted Victory's reply to that message did not provide Franck any meaningful information. After that reply, Franck did not send nor receive any further communications to or from Targeted Victory.

## JURISDICTION

68.     In addition to the claims in the Complaint regrading jurisdiction and venue, this court has jurisdiction over Third Party Defendant Thomas Datwyler via the supplemental jurisdiction permitted by 28 U.S.C. §1367.

## COUNTERCLAIM I – Theft & Conversion

69.     Franck restates and realleges all prior Paragraphs herein.

70.     Plaintiffs have taken and kept profits intended for Franck.

71.     The actions of Plaintiffs are improper and without justification.

72.     Franck experienced damages in an amount in excess of $75,000.00 to be determined at trial.

## COUNTERCLAIM II – UNJUST ENRICHMENT

73.     Franck restates and realleges all prior Paragraphs herein.

74.     Plaintiffs accepted and benefitted from Franck's efforts.

75.     Plaintiffs knew of the value of Franck's efforts based on the agreed upon compensation structure.

76.     Plaintiffs further knew of the value of Franck's efforts due to the revenue produced for each Plaintiff by those efforts.

77.     Plaintiffs retained the benefit of Franck's efforts without properly compensating Franck for the same.

78.     Franck experienced damages in an amount in excess of $75,000.00 to be determined at trial.

## THIRD-PARTY CLAIM I – THEFT & CONVERSION

79.     Franck restates and realleges all prior Paragraphs herein.

80.     Datwyler has taken and kept profits intended for Franck.

81.     The actions of Datwyler are improper and without justification.

82.     Franck experienced damages in an amount in excess of $75,000.00 to be determined at trial.

## THIRD-PARTY CLAIM II – UNJUST ENRICHMENT

83.     Franck restates and realleges all prior Paragraphs herein.

84.     Datwyler accepted and benefitted from Franck's efforts.

85.     Datwyler knew of the value of Franck's efforts based on the representations he made to Franck regarding the amount of profit sharing and other compensation Datwyler promised to Franck to induce Franck to leave his employment with Bell Bank and apply his efforts to the businesses Franck would own with Datwyler.

86.     Datwyler further knew of the value of Franck's efforts due to the revenue produced by those efforts for each business.

87.     Datwyler retained the benefit of Franck's efforts without properly compensating Franck for the same.

88.     Franck experienced damages in an amount in excess of $75,000.00 to be determined at trial.

## THIRD-PARTY CLAIM III – PROMISSORY ESTOPPEL

89.     Franck restates and realleges all prior Paragraphs herein.

90.     Datwyler promised to make Franck a 25% owner of, and ensure Franck received 25% of the profits from, The Free USA, LLC while Swarts was part of that business.

91.     Franck trusted Datwyler and believed Datwyler would make Franck a 25% owner of, and ensure Franck received 25% of the profits from, The Free USA, LLC while Swarts was part of that business.

92.     Relying on Datwyler's promises, Franck left his employment with Bell Bank and performed many of hours of work for Datwyler and The Free USA, LLC.

93.     Datwyler refused or failed to pay Franck any of the profits from The Free USA, LLC.

94.     Justice requires that Datwyler pay Franck 25% of the profits from The Free USA, LLC starting from when Franck performed work for Datwyler and The Free USA, LLC and continuing until such time as Swarts was no longer part of The Free USA, LLC which are believed to be in excess of $75,000.00.

## THIRD-PARTY CLAIM IV – PROMISSORY ESTOPPEL

95.     Franck restates and realleges all prior Paragraphs herein.

96.     Datwyler promised to make Franck 50% owner of, and ensure Franck received 50% of the profits from, The Free USA, LLC after Swarts was no longer part of that business.

97.     Franck trusted Datwyler and believed Datwyler would make him 50% owner of, and ensure Franck received 50% of the profits from, The Free USA, LLC after Swarts was no longer part of the same.

98.    Relying on Datwyler's promises, Franck left his employment with Bell Bank and performed many hours of work for Datwyler and The Free USA, LLC.

99.    Datwyler refused or failed to pay Franck any of the profits from The Free USA, LLC.

100.    Justice requires that Datwyler pay Franck 50% of the profits from The Free USA, LLC starting from when Swarts was no longer part of The Free USA, LLC and continuing until such time as Franck no longer owns 50% of The Free USA, LLC which are believed to be in excess of $75,000.00.

## THIRD-PARTY CLAIM V – PROMISSORY ESTOPPEL

101.    Franck restates and realleges all prior Paragraphs herein.

102.    Datwyler promised to make Franck a 25% owner of 44 North Lists, LLC and ensure Franck received, at least, 25% of the profits from 44 North Lists, LLC.

103.    Franck trusted Datwyler and believed Datwyler would make him a 25% owner of, and ensure Franck received, at least, 25% of the profits from, 44 North Lists, LLC.

104.    Relying on Datwyler's promises, Franck left his employment with Bell Bank and performed many hours of work for Datwyler and 44 North Lists, LLC.

105.    Datwyler refused or failed to pay Franck any of the profits from 44 North Lists, LLC.

106.    Justice requires that Datwyler pay Franck 25% of the profits from 44 North Lists, LLC which are believed to be in excess of $75,000.00.

## THIRD-PARTY CLAIM VI – BREACH OF CONTRACT

107.    Franck restates and realleges all prior Paragraphs herein.

108.   Datwyler offered Franck 25% ownership in, and to pay Franck 25% of the profits from, The Free USA, LLC while Swarts was part of the business in exchange for Franck resigning his employment with Bell Bank and investing his time and efforts into the business of The Free USA, LLC.

109.   Franck accepted Datwyler's offer, resigned his employment with Bell Bank and invested his time and efforts into the business of The Free USA, LLC.

110.   Datwyler breached the contract by failing or refusing to provide Franck 25% ownership in and 25% profits from, The Free USA, LLC during the time Swarts was part of the business.

111.   Due to Datwyler's breach, Franck experienced damages in an amount in excess of $75,000.00 to be determined at trial.

## THIRD-PARTY CLAIM VII – BREACH OF CONTRACT

112.   Franck restates and realleges all prior Paragraphs herein.

113.   Datwyler offered Franck 50% ownership in, and to pay Franck 50% of the profits from, The Free USA, LLC after Swarts' part in the business ended in exchange for Franck resigning his employment with Bell Bank and investing his time and efforts into the business of The Free USA, LLC.

114.   Franck accepted Datwyler's offer, resigned his employment with Bell Bank and invested his time and efforts into the business of The Free USA, LLC.

115.   Datwyler breached the contract by failing or refusing to provide Franck 50% ownership in and 50% profits from, The Free USA, LLC after Swarts' part with the business ended.

116.    Due to Datwyler's breach, Franck experienced damages in an amount in excess of $75,000.00 to be determined at trial.

### THIRD-PARTY CLAIM VIII – BREACH OF CONTRACT

117.    Franck restates and realleges all prior Paragraphs herein.

118.    Datwyler offered Franck 50% ownership in, and to pay Franck 50% of the profits from, The Eagle News Network, LLC in exchange for Franck resigning his employment with Bell Bank and investing his time and efforts into the business of The Eagle News Network, LLC.

119.    Franck accepted Datwyler's offer, resigned his employment with Bell Bank and invested his time and efforts into the business of The Eagle News Network, LLC.

120.    Datwyler breached the contract by failing or refusing to provide Franck 50% ownership in and 50% profits from, The Eagle News Network, LLC.

121.    Due to Datwyler's breach, Franck experienced damages in an amount in excess of $75,000.00 to be determined at trial.

### THIRD-PARTY CLAIM IX – BREACH OF CONTRACT

122.    Franck restates and realleges all prior Paragraphs herein.

123.    Datwyler offered Franck 25% ownership in, and to pay Franck, at least, 25% of the profits from, 44 North Lists, LLC in exchange for Franck resigning his employment with Bell Bank and investing his time and efforts into the business of 44 North Lists, LLC.

124.    Franck accepted Datwyler's offer, resigned his employment with Bell Bank and invested his time and efforts into the business of 44 North Lists, LLC.

125.    Datwyler breached the contract by failing or refusing to provide Franck 25% ownership in and, at least, 25% profits from, 44 North Lists, LLC.

126.    Due to Datwyler's breach, Franck experienced damages in an amount in excess of $75,000.00 to be determined at trial.

### THIRD-PARTY CLAIM X – INTENTIONAL MISREPRESENTATION

127.    Franck restates and realleges all prior Paragraphs herein.

128.    Datwyler represented to Franck that the political fundraising businesses that Datwyler desired Franck to join generated $2,000,000.00 per year in revenue and that Franck would earn a minimum of $200,000.00 per year from his share of the profits from those businesses.

129.    Datwyler knew the political fundraising businesses that Datwyler desired Franck to join generated less than $2,000,000.00 per year in revenue and that Franck's share of the profits from those businesses would be less than $200,000.00 per year.

130.    Datwyler knew Franck was relying on Datwyler's representations regarding the revenue and profitability of the political fundraising businesses that Datwyler desired Franck to join when Franck decided to resign his employment with Bell Bank.

131.    Franck relied on Datwyler's representations regarding the revenue and profitability of the political fundraising businesses that Datwyler desired Frank to join when Franck resigned his employment with Bell Bank and made those political fundraising businesses his primary professional focus, investing time and effort into the same.

132.    Due to his reliance on Datwyler's misrepresentations, Franck experienced damages in an amount in excess of $75,000.00 to be determined at trial.

## THIRD-PARTY CLAIM XI – BREACH OF FIDUCIARY DUTY

133.   Franck restates and realleges all prior Paragraphs herein.

134.   Datwyler and Franck co-owned multiple businesses.  As co-owners, they owed each other fiduciary duties.  One such duty is that Datwyler owed Franck the duty of good faith and fair dealing.

135.   Datwyler misled Franck regarding the revenue, profitability and general financial well-being of the businesses he co-owned with Franck.  In doing so, Datwyler breached his duty of good faith and fair dealing.

136.   Due to Datwyler's breach, Franck experienced damages in an amount in excess of $75,000.00 to be determined at trial.

## JURY DEMAND

Defendant demands a trial by jury on all claims so triable.

**WHEREFORE,** Defendant, Gabriel Franck hereby requests the following relief:

1.   Dismissing Plaintiff's claims with prejudice and on the merits;

2.   As to Defendants' Counterclaims, adjudging, declaring and decreeing that Plaintiff is not entitled to collect from Defendant the damages as set forth in Plaintiffs' Complaint;

3.   Awarding Defendant judgment declaring his ownership in Plaintiff 44 North Lists, LLC;

4.   Awarding Defendant judgment declaring his ownership in Plaintiff The Free USA, LLC;

5. Awarding Defendant judgment declaring his ownership in Plaintiff Right Donor Builders PDM, LLC;

6. Awarding Defendant judgment declaring his ownership in the The Eagle News Network, LLC;

7. Awarding Defendant judgment against Plaintiffs' as a result of Plaintiffs' conduct in an amount in excess of $75,000.00;

8. Awarding Defendant judgement against Third Party Defendant as a result of Third-Party Defendants' conduct in an amount in excess of $75,000.00;

9. Awarding Defendant his reasonable attorney fees, costs and disbursements incurred herein, as well as pre-judgment interest as allowed by law;

10. For such other relief as this Court deems just and equitable.


Under Federal Rule of Civil Procedure 11, Defendant, through his counsel, certifies to the best of his knowledge, information, and belief that this Answer, Counterclaim and Third-Party Claim: (1) is not being presented for an improper purpose, such as to harass, cause unnecessary delay, or needlessly increase the cost of litigation; (2) is supported by existing law or by a nonfrivolous argument for extending, modifying, or reversing existing law; (3) the factual contentions have evidentiary support or, if specifically so identified, will likely have evidentiary support after a reasonable opportunity for further investigation or discovery; and (4) the Answer, Counterclaim and Third-Party Claim otherwise complies with the requirements of Rule 11.


Dated: <u>January 12, 2024</u>     By:     <u>/s/Kristopher J Krentz</u>
                                            Kristopher J. Krentz, Esq.
                                            Bar #0308195
                                            PO Box 865
                                            Osceola, WI 54020
                                            Kris@Krentzlaw.com
                                            952.905.3291

                                            Attorney for Defendant/Third-Party Plaintiff