**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF WISCONSIN**

| | |
|---|---|
| Same Day Processing, Inc.;<br>44 North Lists LLC;<br>Right Donor Builders PDM LLC; and<br>The Free USA, LLC<br><br>　　　　Plaintiffs/Counterclaim<br>　　　　Defendants<br><br>vs.<br><br>Gabriel Franck<br><br>　　　　Defendant/Counterclaim<br>　　　　Plaintiff/Third-Party Plaintiff<br><br>vs.<br><br>Thomas Datwyler<br><br>　　　　Third-Party Defendant. | Civil No. 23-731<br><br><br><br>**MEMORANDUM OF LAW IN<br>OPPOSITION TO<br>PLAINTIFFS/COUNTERCLAIM<br>DEFENDANTS AND THIRD-PARTY<br>DEFENDANT'S MOTION TO DISMISS<br>AMENDED COUNTERCLAIMS AND<br>THIRD-PARTY CLAIMS** |

Defendant/Counterclaim Plaintiff Gabriel Franck ("Mr. Franck") submits this Memorandum of Law in opposition to the Motion to Dismiss Amended Counterclaims and Third-Party Claims submitted by Plaintiffs/Counterclaim Defendants Same Day Processing, Inc. ("SDP"), 44 North Lists LLC ("44 North"), Right Donor Buildings PDM LCC ("RDB"), and The Free USA, LLC ("The Free USA") as-well-as Third-Party Defendant Thomas Datwyler's ("Mr. Datwyler").

## INTRODUCTION

Starting in late 2021, Mr. Franck, a recent college graduate with a bright future, forwent a promising, stable career in the banking industry to "take the plunge" and become an entrepreneur in the political fundraising arena, pursuant to numerous promises made by Mr. Datwyler to Mr.

Franck, and multiple agreements made between Mr. Franck and Mr. Datwyler, concerning the ownership, operation and profitability of 44 North, RDB, and The Free USA. Those promises and agreements ultimately went unfulfilled to Mr. Franck's great detriment. In short, Mr. Datwyler used and took advantage of Mr. Franck's naivety on many occasions, so that Mr. Datwyler could continue lining his pockets at the cost of Mr. Franck's hard work.

Despite these points and detailed factual allegations of the same, Plaintiffs/Counterclaim Defendants and Third-Party Defendant Datwyler (hereinafter collectively "Plaintiffs") are unreasonably demanding that the Court immediately dismiss *every* counterclaim and third-party claim that Mr. Franck has painstakingly alleged against them in Defendant's Amended Answer Counterlcaims & Third-Party Claims, while disregarding the absolute truth that the Court must afford to the pleaded facts on such a motion. Plaintiffs have downplayed and miscalculated the strong degree of deference that this Court *must* afford the facts that Mr. Franck has set forth in his pleading.

As if this was not enough, Plaintiffs contort and misstate the law in their Motion.  For example, Plaintiffs suggest that conversion must lie solely against physical goods, despite longstanding Wisconsin case law that claims for conversion of money are well-established under law.  Likewise, Plaintiffs inappropriately attempt to drag in extrinsic evidence of LLC agreements not referenced in Mr. Franck's pleadings in violation of the tenets of a Rule 12(b)(6) motion.  As further detailed herein, Mr. Franck respectfully requests that the Court deny Plaintiffs' Motion to Dismiss Amended Counterclaims and Third-Party Claims.

## FACTS

a. **Mr. Franck's Bright Future and Mr. Datwyler, His Trusted Advisor, and the Co-Owner of 44 North, RDB, and The Free USA.**

In May 2020, Mr. Franck graduated from the University of Wisconsin-Madison with a degree in Political Science. (Counterclaims ¶ 6.) After graduation, while searching for jobs, Mr. Franck moved back with his parents in Hudson, Wisconsin. (*Id.*) Mr. Datwyler resides across the street and a few houses from Mr. Franck's parents. (*Id.* at ¶ 7.) Mr. Datwyler apparently owns an interest in a variety of business ventures including SDP, 44 North, RDB, and The Free USA. (*Id.* at ¶¶ 2-5.) Mr. Franck's father, Todd Franck, and Mr. Datwyler's father, grew up in the Hudson, Wisconsin area and attended the same K-12 schools. (*Id.* at ¶ 8.)

In or around March 2021, Mr. Franck and Mr. Datwyler became friends. (*Id.* at ¶ 9.) Over several months, Mr. Datwyler invited Mr. Franck numerous times to join Mr. Datwyler for exercise together at the gym located in Mr. Datwyler's private residence. (*Id.*) During that time, Mr. Datwyler and Mr. Franck got to know each other. (*Id.*) Mr. Franck informed Mr. Datwyler that he was a recent graduate with a degree in political science (*Id.*) Mr. Datwyler claimed he, and some of his businesses, were active in the political field. (*Id.*) Mr. Datwyler further claimed to have multiple contacts in the political field. (*Id.*)

Due to the familiarity between the Franck and Datwyler families, the neighborly relationship enjoyed between Mr. Franck and Mr. Datwyler's families, and the conversations between Mr. Franck and Mr. Datwyler, Mr. Franck viewed Mr. Datwyler as a trusted mentor. (*Id.* at ¶ 10.)

**b. Mr. Datwyler Begins Approaching Mr. Franck About Going Into Business Together, Mr. Franck Secures a Job at Bell Bank, Mr. Datwyler Tries Convincing Mr. Franck to Leave, and Mr. Datwyler Starts Making Representations to Mr. Franck About Mr. Franck's Interest in and Profits from The Free USA.**

On or about June 22, 2021, Mr. Datwyler suggested to Mr. Franck that Mr. Franck join Mr. Datwyler in one or more of Mr. Datwyler's business ventures. (*Id.* at ¶ 11.) Mr. Franck offered to work with Mr. Datwyler if needed; however, at that time, no projects were undertaken by Mr. Franck with, or on behalf of, Mr. Datwyler, and Mr. Franck continued his job search. (*Id.*) Mr. Datwyler continued to reach out to Mr. Franck numerous times to further gain Mr. Franck's trust and discuss business opportunities. (*Id.*)

In or around August 2021, Mr. Franck accepted a position with Bell Bank in Woodbury, Minnesota. (*Id.* at ¶ 12.) That position paid a base salary of $50,000.00 per year with opportunities for bonuses and with benefits such as retirement account matching and health insurance. (*Id.*) Mr. Franck informed Mr. Datwyler of his new position at Bell Bank. (*Id.*) Mr. Datwyler inquired about the compensation Mr. Franck would receive in that position. (*Id.*) After Mr. Franck described that compensation, Mr. Datwyler offered to pay Mr. Franck $5,000.00 per month to join Mr. Datwyler's political fundraising business. (*Id.*) Mr. Franck initially rejected that offer because he was not interested in moving from Bell Bank for merely equal compensation. (*Id.*) Mr. Franck clarified that he would not leave his position at Bell Bank unless the offer included compensation greater than what Bell Bank paid. (*Id.*)

On or around August 25, 2021, Mr. Datwyler offered Mr. Franck a business opportunity. (*Id.* at ¶ 14.) Mr. Datwyler claimed to own and control The Free USA. (*Id.*) The day-to-day functions of that business were run by Mr. Swarts, who, Mr. Datwyler claimed, was not performing due to "laziness." (*Id.*) Mr. Datwyler told Mr. Franck that Mr. Datwyler wanted to replace Mr. Swarts with Mr. Franck. (*Id.*) Mr. Datwyler further claimed that, despite his underperformance,

4

Mr. Swarts earned between $30,000.00 and $60,000.00 per month. (*Id.*) Mr. Datwyler then showed Mr. Franck documentation that stated the business had generated more than $2,000,000.00 in a single year. (*Id.*) Mr. Datwyler represented to Mr. Franck that, if Mr. Franck accepted Mr. Datwyler's offer, once Mr. Franck replaced Mr. Swarts, Mr. Franck would earn between $30,000.00 and $60,000.00 per month. (*Id.*) Mr. Datwyler further represented to Mr. Franck that, if Mr. Franck accepted Mr. Datwyler's offer, Mr. Franck would earn a minimum of $200,000.00 per year even while Mr. Swarts remained part of the business. (*Id.*) Mr. Franck agreed to consider that offer. (*Id.*)

### c. Mr. Franck Begins Educating Himself About the Political Fundraising Arena and Starts Working for The Free USA.

In late September 2021, Mr. Franck began to learn from Mr. Datwyler how the political fundraising business raised funds via e-mail. (*Id.*) In or about October 2021, Mr. Franck and Mr. Datwyler again discussed how they would co-own political fundraising businesses, including the ownership structure for the business and Mr. Francks' compensation outside of profit sharing. (*Id.*) Mr. Datwyler offered Mr. Franck 50% ownership in any business in which Mr. Datwyler and Mr. Franck were the only owners. (*Id.*) Mr. Datwyler further offered to pay Mr. Franck a minimum amount of $2,000.00 per month until profits consistently reached the $200,000.00 per year minimum profit sharing that Mr. Datwyler had previously promised and represented to Mr. Franck. (*Id.*) Mr. Franck accepted this proposal, and the parties agreed that those would be the baseline terms to structure any business relationship they entered into together. (*Id.*)

For Mr. Datwyler's 50% interest in each business that he owned with Mr. Franck, Mr. Datwyler was to: provide business experience, create and maintain proper legal structure for each business, provide raw data that each business would process and turn into lists of potential donors, manage the finances of each business, and invest some operating capital as needed into each

business. (*Id*. at ¶ 17.) Besides those items, Mr. Datwyler would be hands-off—providing no day-to-day effort on behalf of the business. (*Id*.)

For Mr. Franck's 50% interest in each business that he owned with Mr. Datwyler, Mr. Franck was to make the business owned with Mr. Datwyler Mr. Franck's primary focus. (*Id*. at ¶ 18.) Accordingly, Mr. Franck was to provide, among other things, his time to process the raw data, establish accounts with third-party vendors to both further process the raw data and enable the business to send numerous texts and/or e-mails at one time, track success and failure of the businesses' efforts and use the same to update the data and oversee the short- and long-term goals and operations of each business. (*Id*.)

Mr. Datwyler and Mr. Franck both understood that Mr. Franck would need to resign from his job at Bell Bank, so that Mr. Franck could make these new businesses his primary professional focus, and that Mr. Franck's reliance on this business opportunity would result in Mr. Franck losing the Bell Bank $50,000 per year salary, opportunities for bonuses, and fringe benefits, including, but not limited to, retirement account matching and health insurance. (*Id*.)

On or about November 22, 2021, Mr. Datwyler instructed Mr. Franck to complete an IRS W-9 form to receive $2,000.00 per month from The Free USA. (*Id*. at ¶ 20.) Mr. Franck complied and provided Mr. Datwyler with a fully executed IRS W-9 form. (*Id*.) Before Mr. Franck resigned from his job at Bell Banck, to ensure he could perform the tasks assigned, he sought to learn more about how these types of political fundraising businesses operated. (*Id* at 21.) Mr. Datwyler informed Mr. Franck that he would send Mr. Franck the information needed for Mr. Franck to understand what he would need to accomplish. (*Id*.)

On or about November 30, 2021, Mr. Datwyler emailed a set of raw data to Mr. Franck's e-mail account ("Mr. Franck's Gmail"). (*Id*. at ¶ 22.) In or around that same time, Mr. Swarts sent

Mr. Franck an email providing access to a Google work folder labeled "The Free USA." (*Id*. at ¶ 23.)

After working with the raw data and the information and documentation in The Free USA Google work folder, Mr. Franck was confident he could perform the duties required by the promised agreement he reached with Datwyler regarding the political fundraising business. (*Id*. at ¶ 24.)

In or about November 2021, Mr. Franck notified Mr. Datwyler he was ready to move forward with their joint businesses per the terms discussed in October 2021. (*Id*. at ¶ 25.) Mr. Datwyler suggested that, instead of starting a new business, Mr. Franck join The Free USA. (*Id*.) Due to Mr. Swarts owning a portion of The Free USA, Mr. Datwyler offered Mr. Franck 25% ownership in The Free US with all other terms remaining as previously agreed between Mr. Datwyler and Mr. Franck. (*Id*.) Mr. Datwyler, again, represented that the 25% ownership interest in The Free USA would pay Mr. Franck a minimum of $200,000 per year via profit sharing. (*Id*.) Mr. Datwyler further offered to increase Mr. Franck's ownership to 50% once Mr. Swarts was no longer a part of The Free USA. (*Id*.) Mr. Datwyler confirmed to Mr. Franck that Mr. Datwyler would ensure Mr. Franck received 50% ownership in any business where Mr. Datwyler and Mr. Franck were the co-owners. (*Id*.) Mr. Franck accepted Mr. Datwyler's offers. (*Id*.)

**d. Mr. Franck Resigns from His Job at Bell Bank.**

Relying on Mr. Datwyler's promises to ensure Mr. Franck received 25% ownership in The Free USA, which would pay Mr. Franck a minimum of $200,000.00 per year via profit sharing, that Mr. Franck's ownership interest would increase to 50% when Mr. Swarts was no longer a part of The Free USA, that Mr. Datwyler would ensure Mr. Franck received 50% ownership in any other business in which Mr. Datwyler and Mr. Franck were the only owners, and that Mr. Datwyler

would pay Mr. Franck $2,000 a monthly until profits were consistently distributed to reach the $200,000.00 per year minimum profit sharing Mr. Datwyler had promised Mr. Franck would earn, Mr. Franck resigned his job at Bell Bank. (*Id*. at ¶ 27.) In doing so, Mr. Franck forewent, among other things, a $50,000 per year salary, opportunities for bonuses, and all benefits, including, but not limited to, retirement account matching and health insurance. (*Id*.)

On or about December 2021, Mr. Franck notified Mr. Datwyler that Mr. Franck resigned from his position at Bell Bank and was starting his full-time efforts on behalf of their businesses. (*Id*. at ¶ 28.) Mr. Datwyler responded, "[y]ou the man! Let's fucking go." (*Id*.) On or about January 10, 2022, Mr. Datwyler notified Mr. Franck that Mr. Swarts refused or failed to return Mr. Datwyler's calls. (*Id*. at ¶ 29.) Mr. Datwyler informed Mr. Franck that Mr. Franck needed to take over all the work done by Mr. Swarts because Mr. Swarts was no longer reliable. (*Id*.)

**e. Mr. Franck Begins Expressing Concerns to Mr. Datwyler About the Businesses' Profitability, and Mr. Datwyler is Overworking and Underpaying Mr. Franck.**

On or about March 3, 2022, after taking on a larger workload than initially agreed, Mr. Franck expressed concern to Mr. Datwyler that Mr. Franck had not received any of the profits from their businesses, and that $2,000 was not enough to justify working long hours seven days a week. (*Id*. at ¶ 30.) Mr. Datwyler claimed business had slowed and was no longer profitable. (*Id*.) Mr. Datwyler asked Mr. Franck to hang with him a little longer because they would be making money as soon as Mr. Swarts was out. (*Id*.) Trusting his mentor, Mr. Franck continued his efforts on behalf of Mr. Datwyler and Mr. Franck's business. (*Id*.)

In or about March 2022, Mr. Franck attended educational meetings to learn the laws and regulations related to campaign financing. (*Id*. at ¶ 31.) Mr. Franck then established the accounts necessary for Mr. Datwyler and Mr. Franck's businesses to send donation requests via text messaging. (*Id*.) On or about April 20, 2022, Mr. Datwyler notified Mr. Franck that Mr. Datwyler

had another check for Mr. Franck. (*Id*. at ¶ 32.) Among other things, Mr. Datwyler stated, "[g]oing to keep paying you until we turn a profit on this . . . . ." (*Id*.)

On or about June 8, 2022, Mr. Datwyler emailed Mr. Franck another set of raw data. (*Id*. at ¶ 33.) On or about December 5, 2022, Mr. Swarts locked Mr. Franck out of the vendor accounts used by The Free USA to conduct its business. (*Id*. at ¶ 34.) Mr. Swarts failed or refused to respond to Mr. Franck's communication attempts. (*Id*.) Mr. Swarts also failed or refused to respond to Mr. Datwyler's attempt to communicate and never returned any documents, data, information, etc., owned by The Free USA. (*Id*. at ¶ 35.)

Due to Mr. Swarts cutting Mr. Franck and Mr. Datwyler off from the accounts and data of The Free USA, including, among other things, the Google work folder and third-party vendor accounts of The Free USA which were used to process the raw data and send out mass text and e-mail messages, Mr. Franck and Mr. Datwyler decided to start from scratch. (*Id*. at ¶ 36.) On or about January 2, 2023, Mr. Datwyler notified Mr. Franck that they needed to set up a company "for the two of us" to operate their business through. (*Id*. at ¶ 37.) Mr. Datwyler instructed Mr. Franck to establish the third-party vendor accounts necessary for their new business to conduct business similar to how The Free USA conducted its business. (*Id*.)

From the beginning of these joint business efforts, Mr. Franck worked from home. (*Id*. at ¶ 38.) On or about January 2, 2023, to allow Mr. Franck to leave Mr. Franck's house from time to time, Mr. Datwyler offered to Mr. Franck the use of some office space at SDP. (*Id*.) Mr. Franck accepted that offer until Mr. Franck realized there was no specific office actually available for Mr. Franck to work. (*Id*.) Instead, the space made available for Mr. Franck at the SDP location (previously a residential home that Mr. Datwyler used as a commercial office), was a basement stairway landing. (*Id*.) After that, Mr. Franck worked primarily from his home while still going

into SDP's office periodically—often to ensure Mr. Franck had an opportunity to talk with Mr. Datwyler. (*Id*.)

### f.   Mr. Datwyler Suggests Mr. Datwyler Find a New Job, The Eagle News Network and 44 North are Formed, and Mr. Franck Starts Working for The Eagle News Network and 44 North.

In January 2023, after Mr. Franck raised concerns over the lack of profits, Mr. Datwyler stated the businesses were not profitable and suggested Mr. Franck attempt to take another job. (*Id*. at ¶ 39.) Regardless, Mr. Franck and Mr. Datwyler agreed to call the new company, The Eagle News Network ("The Eagle"). (*Id*. at ¶ 41.) With no other owners besides Mr. Datwyler and Mr. Franck, Mr. Datwyler was to ensure Mr. Franck received a 50% ownership interest. (*Id*.) Mr. Datwyler stated he would get the paperwork drawn up to establish The Eagle. (*Id*.)

On or about January 6, 2023, Mr. Datwyler showed Mr. Franck a Delaware Certificate of Formation for a limited liability company named "The Eagle News Network LLC" and instructed Mr. Franck to sign the same. (*Id*. at ¶ 42.) Mr. Franck signed and returned the fully executed Certificate of Formation to Mr. Datwyler. (*Id*.) Mr. Franck relied upon Mr. Datwyler's promise to create and maintain proper legal structures for each business when believing Mr. Datwyler would ensure that a fully executed Certificate of Formation was properly filed and all other documents necessary to properly establish that business, per the previously agreed upon terms, were in place. (*Id*.)

To avoid donor fatigue and e-mail servers from flagging their mass mailings as "spam" or "junk," Mr. Datwyler and Mr. Franck utilized additional businesses and/or business names that did the same or similar work as The Eagle. (*Id*. at ¶ 45.) RDM was one such business. (*Id*.) Mr. Datwyler represented to Mr. Franck that Mr. Datwyler would transfer the income from those businesses into The Eagle, so that such income would be distributed under the Eagle's business

10

ownership structure. (*Id*. at ¶ 46.) On or about January 10, 2023, Mr. Datwyler, from Mr. Datwyler's Gmail, sent Mr. Franck another raw data set to Mr. Franck's Gmail. (*Id*. at ¶ 47.)

On or about June 20, 2023, Mr. Franck and Mr. Datwyler, along with Brian Chatwin ("Mr. Chatwin"), Mr. Datwyler's cousin, Ryan Datwyler ("Mr. Datwyler's Cousin") and Mr. Datwyler's brother, Timothy Datwyler ("Mr. Datwyler's Brother"), created 44 North. (*Id*. at ¶ 49 & 51.) Mr. Datwyler offered Mr. Franck 25% ownership in that business in exchange for Mr. Franck providing the same services he provides to The Eagle. (*Id*. at ¶ 49) Because Mr. Datwyler desired to keep certain funds and opportunities from Mr. Chatwin, Mr. Datwyler further offered to ensure Mr. Franck received 50% of profits from the accounts known only to Mr. Datwyler and Mr. Franck. (*Id*.) Mr. Franck accepted Mr. Datwyler's offers and began investing time and energy in 44 North. (*Id*.)

### g. Mr. Franck Learns that the Businesses are Very Profitable, and Mr. Datwyler Cuts Mr. Franck Out of All Businesses.

Still receiving much less money than Mr. Datwyler previously promised, Mr. Franck continued to express his concern and frustration to Mr. Datwyler regarding Mr. Datwyler's claim that their businesses lacked profits. In or about August 2023, Mr. Franck was copied on an electronic mail indicating that the business he was the owner of and entitled to profits from was, contrary to Mr. Datwyler's claims, very profitable. (*Id*.) Mr. Franck made multiple attempts to discuss this information with Mr. Datwyler. (*Id*.) Mr. Datwyler refused or failed to communicate with Mr. Franck regarding the same. (*Id*.)

On or about August 30, 2023, Mr. Franck sent Mr. Datwyler's brother an e-mail explaining the situation. (*Id*. at ¶ 51.) Mr. Franck informed Mr. Datwyler's brother that Mr. Franck found information indicating the businesses, including 44 North, were profitable, contrary to Mr. Datwyler's assertions. (*Id*.) Mr. Franck asserted his belief that he and his fellow owners were owed

an explanation from Mr. Datwyler regarding the business's financial status. (*Id*.) On or about August 31, 2023, Mr. Datwyler notified Mr. Franck that Mr. Franck was suddenly cut out of all businesses. (*Id*. at ¶ 53.)

## **LEGAL STANDARD**

Plaintiffs assert a motion for failure to state a claim upon which relief can be granted under Federal Rule of Civil Procedure 12(b)(6) in response to the counterclaims that Mr. Franck has asserted against them. *See* Fed. R. Civ. P. 12(b)(6).   Such a motion poses a high bar that Plaintiffs fail to surpass. Notably, "to survive a motion to dismiss, a complaint must contain sufficient factual matter, *accepted as true*, to 'state a claim to relief that is *plausible on its face*.'"[1] *Ashcroft v. Iqbal*, 556 U.S. 662, 678, 129 S. Ct. 1937, 1949, 173 L. Ed. 2d 868 (2009) (citing *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570, 127 S. Ct. 1955, 167 L. Ed. 2d 929 (2007)) (emphasis added). A pleading is not subject to Rule 12 dismissal unless it appears _to a certainty_ that the plaintiff cannot possibly be entitled to relief under any set of facts which could be proved in support of his claim. *Seymour v. Union News Co*., 217 F.2d 168 (7th Cir. 1954). The complaint must be construed liberally, with all factual allegations deemed to be true and with doubts to be resolved in favor of the pleader. *Parr v. Great Lakes Exp. Co*., 484 F.2d 767, 770 (7th Cir. 1973); *Jung v. K. & D. Mining Co*., 260 F.2d 607, 608 (7th Cir. 1958). Further, the Court should draw reasonable inferences from those facts in favor of the nonmovant as well.  *See Iqbal* at 678. ("claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged"; *citing Twombly,* 550 U.S. at 556,

---

[1] Of course, despite referring to "complaint," this standard applies to a counterclaim and third-party complaint, as all three fit under the definition of "Pleading," pursuant to F.R.C.P. 7(a). *See* Fed. R. Civ. P. 7(a).

127 S. Ct. 1955). "The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Id.*

"Determining whether a complaint states a plausible claim for relief will . . . be a context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Id*. at 679 (citation omitted). "When there are well-pleaded factual allegations, a court *should* assume their veracity and then determine whether they plausibly give rise to an entitlement to relief." *Id*. (emphasis added). The Seventh Circuit has interpreted the *Twombly/Iqbal* standard such that the pleading must include "enough details about the subject-matter of the case to *present a story that holds together*." *Swanson v. Citibank, N.A.*, 614 F.3d 400, 404 (7th Cir. 2010) (emphasis added).

Taken together, when Mr. Franck's facts are accepted as true and reviewed with reasonable inferences in a light most favorable to him, there can be no doubt he has provided ample detail to "present a story that holds together," his claims are "plausible on their face," and the Court should deny Plaintiffs' motion for failure to state a claim upon which relief can be granted, especially considering the level of judicial restraint from granting the same.

## ARGUMENT

I. **PLAINTIFFS IMPROPERLY ATTEMPT TO BRING IN EXTRINSIC EVIDENCE IN THE FORM OF LIMITED LIABILITY COMPANY AGREEMENTS THAT ARE OUTSIDE THE SCOPE OF MR. FRANCK'S PLEADINGS.**

Rule 12(b)(6) motions require not only that all well-pleaded facts be deemed true, but also prohibit the moving party from submitting evidence or materials outside of those pleadings. Further, if extrinsic evidence is brought in, then the matter is converted into a summary judgment motion. However, in such a scenario, Mr. Franck must be first permitted to complete discovery and provide all evidence to the court before summary judgment can duly be considered. See

F.R.C.P. 12(d) ("If, on a motion under Rule 12(b)(6) or 12(c), matters outside the pleadings are presented to and not excluded by the court, the motion must be treated as one for summary judgment under Rule 56. All parties must be given a reasonable opportunity to present all the material that is pertinent to the motion."); F.R.C.P. 56(d) (if nonmovant cannot present facts essential to justify its opposition to a summary judgment motion, then court may: (1) defer or deny it; (2) allow time for discovery; or (3) issue other appropriate order).

The district court must determine if the complaint alone is sufficient to state a claim; the district court cannot review matters outside of the complaint. *See Casanova v. Ulibarri*, 595 F.3d 1120, 1125 (10th Cir. 2010);  *Garcia v. Fannie Mae*, 794 F.Supp.2d 1155 (D. Or. 2011); *Gossett v. Barnhart*, 139 F. App'x 24, 25 (10th Cir. 2005) (unpublished); *Vosgerichian v. Commodore Intern.*, 862 F. Supp. 1371 (E.D. Pa. 1994). There are three limited exceptions to this general principle: (i) documents that the complaint incorporates by reference, *see Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 322, 127 S. Ct. 2499, 168 L.Ed.2d 179 (2007); (ii) "documents referred to in the complaint if the documents are central to the plaintiff's claim and the parties do not dispute the documents' authenticity," *Jacobsen v. Deseret Book Co.*, 287 F.3d 936, 941 (10th Cir. 2002); and (iii) "matters of which a court may take judicial notice," *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. at 322, 127 S. Ct. 2499.  Here, Plaintiffs go far beyond the foregoing limited exceptions.  Their motion attempts to add extrinsic documents via Mr. Datwyler's declaration that are not specifically attached to nor referenced in Mr. Franck's counterclaims.  Mr. Franck is not a named party to those documents and disagrees that they accurately reflect or relate to the representations and agreements made by Mr. Datwyler.  They are not referenced or incorporated into the counterclaims.  Nor are the private LLC agreements the type of record of which the Court can take "judicial notice."  Although Mr. Franck makes allegations against and

about these limited liability companies, that does not mean that Plaintiff can simply bring in any old documents it chooses on a 12(b)(6) motion. Plaintiffs' efforts are improper, and the Court must disregard those documents.

## II.    PLAINTIFFS' GENERAL AND REPEATED ASSERTIONS ABOUT ALLEGED FAILURE BY FRANCK TO OUTLINE THE AMOUNTS OF OR PROOF OF LOST PROFITS WITH SPECIFICITY IS AN INAPPOSITE AND UNAVAILING ARGUMENT.

In numerous aspects and sections of their Motion, Plaintiffs attempt to argue that lack of specified amounts of lost profits is fatal to Mr. Franck's claims. They are incorrect. The overarching theme of Plaintiffs' arguments for dismissal is essentially that Mr. Franck failed to plead the amount of damages with specificity.  While Plaintiffs employ the words "profits" or "figures" in their arguments, in this situation, they are really demanding Mr. Franck plead damages with numerical specificity.  The Federal Rules of Civil Procedure require only "a demand for relief sought" and state no requirement of particularity or specificity when pleading a claim for monetary compensation or damages. Fed. R. Civ. P. 8(a)(3).  Even for issues outside of damages, the standard is not as high as Plaintiffs allege. Per the United States Supreme Court, the rules require only a "short and plain statement of the claims that will give the defendant fair notice of what the plaintiff's claim is and the grounds upon which it rests." *Conley v. Gibson,* 355 U.S. 41, 47-48 (internal citations and footnotes omitted) (1957). *See also Pennsylvania Nat. Mut. Cas. Ins. Co. v. City of Pine Bluff*, 354 F.3d 945, 950 (8th Cir. 2004) (failure of pleading to even mention the term "damages" was not fatal to the party's request for monetary relief, as a liberal reading of the pleading indicated such relief was contemplated).

Not only does the Counterclaim put Plaintiffs on notice regarding Mr. Franck's claims but Plaintiffs possess, and are in control of, the information necessary to 'fill in the blanks' of what they claim is missing.  In describing the ownership interests and expectations for profit sharing,

Mr. Franck lays out the ownership percentages.   All that is missing is - easily discoverable - numbers to plug into that formula.

Mr. Datwyler promised to oversee the creation, financing and other big picture issues for the businesses in question and withheld that information from Mr. Franck throughout their work together (Counterclaim ¶¶ 30, 50 & 51). Mr. Franck has not been afforded an opportunity to conduct any discovery which would grant him the ability to provide the specifics Plaintiffs demand.  Regardless, Plaintiffs will suffer no surprise regarding Mr. Franck's claims once that information is made part of the record because it is already in their possession and control.  As is made clear by the facts alleged in the Complaint and Plaintiffs' arguments for dismissal, Plaintiffs already know the amount of income enjoyed by each business at issue, expenses incurred by each business at issue and whether any such business was profitable – and, if so, where those profits went. With that information, Mr. Franck could potentially provide specifics, and will do so following discovery.

This is not a situation where the Plaintiffs will be surprised by any of the facts they claim are missing. To the contrary, Mr. Franck is the one in the dark. While he may not know the exact amounts or where they went, Mr. Franck does know the Plaintiffs made money off his efforts and that those funds were kept by one, some or all of the Plaintiff parties and/or Mr. Datwyler.  When Plaintiffs produce that information during basic discovery, there will be no surprises on their end when Mr. Franck uses that information at trial. Their arguments in this regard are unavailing.

## III.    MR. FRANCK SUFFICIENTLY STATES CLAIMS FOR CIVIL THEFT AND CONVERSION AGAINST PLAINTIFFS UNDER COUNTERCLAIM I AND THIRD-PARTY CLAIM I.

Plaintiffs' assertions regarding conversion primarily relate to a smattering of obscure out-of-state cases to suggest that conversion only applies to "chattel."  Observe, Mr. Franck asserts

that the Plaintiffs wrongfully took and converted "business profits" from Mr. Franck, in other words, they converted *money*.  In cases over a century old, the Wisconsin Supreme Court held that claims for conversion applies to money.  *See Regas v. Helios*, 176 Wis. 56, 186 N.W. 165 (1922) (money is as much a subject of conversion as any other personal property); *Meyer v. Doherty*, 133 Wis. 398, 113 N.W. 671 (1907); *see also H.A. Friend & Co. v. Professional Stationery, Inc*., 294 Wis.2d 754 (Wis. App. 2006) (claims for civil theft and conversion were properly pled regarding monies wrongfully spent out of and taken from bank accounts).  The elements of conversion are: (1) intentional control or taking of property belonging to another, (2) without the owner's consent, (3) resulting in serious interference with the rights of the owner to possess the property.  *H.A. Friend & Co. v. Professional Stationery, Inc*., 294 Wis.2d 754 (Wis. App. 2006).

Plaintiffs' reliance upon the district court case of *Home Casual Enterprises* relating to the alleged conversion of "purchase orders" is different and apart from Mr. Franck's situation involving a claim for converted *money*.   Further, Plaintiffs baldly assert, without authority, that Mr. Franck must specify the amounts of dollars converted to state a claim for relief—the law contains no such requirement.

Viewed as a whole, the facts as pled outline that Mr. Franck was duly entitled to monetary profit from various joint business ventures he engaged in with Mr. Datwyler, particularly 44 North, The Free USA, and The Eagle, and that Mr. Datwyler intentionally took sole control of Mr. Franck's funds against his wishes and without his consent.  Plaintiffs argue that Mr. Franck's allegations are "conclusory" but, to be sure, Mr. Franck's allegations go far beyond simply reciting the legal elements of conversion as outlined above—he has specified the nature of his entitlement to business profits, and that those business profits were wrongfully derived from him.  Given Mr. Datwyler's control over the structure, documents and finances of the businesses, Mr. Franck cannot

be expected to plead his claims with any more specificity than was done without an entitlement to conduct discovery. This claim is adequately pled and not subject to dismissal.

Plaintiffs then assert Mr. Franck has not adequately alleged an ownership interest in the various LLC entities, primarily and improperly relying upon the LLC agreements that are outside the scope of Mr. Franck's counterclaims.  To be clear, due to Mr. Datwyler's refusal or failure to fulfill his promises and agreements in regard to the businesses he co-owned with Mr. Franck, it may be possible that not all business ventures were formalized into correctly-formatted limited liability company documents—but those breaches of obligation by Mr. Datwyler and lack of proper and expected documentation are merely strong evidence of his breaches of duty.  And further, the existence of documentation, or lack thereof, is not relevant on this particular motion, which takes all stated facts as truth.

During their work together, Mr. Datwyler intentionally withheld information from Mr. Franck regarding the structure of their businesses and the financial performance of the same. Regardless, at this pleading stage Mr. Franck has asserted, in detail, the numerous promises and agreements made to him by Mr. Datwyler regarding joint ownership of the various business entities at issue in the Counterclaims, and those assertions, taken as true as the Court and Plaintiffs must at this stage, state ample claims for Mr. Franck's co-ownership of the businesses.  Those include a general promise by Mr. Datwyler to make Mr. Franck a 50% owner of any entity in which Mr. Datwyler and Mr. Franck were the only owners and a minimum 25% owner for any entity which included owners in addition to Mr. Datwyler and Mr. Franck, along with the promise by Mr. Datwyler to ensure all the appropriate documents to create the businesses in that fashion were in place – entities such as The Free USA and 44 North. Further, the Court is duty bound at this early

stage to disregard those arguments that rely upon materials well outside the scope of Mr. Franck's pleading.

Plaintiffs take their arguments even further, asserting that Mr. Franck must allege that there were actions or decisions by The Free USA, 44 North, or RDB to make profit distributions. Plaintiffs attempt to draw the issues far down into the weeds so as to put Mr. Franck in a position well beyond arguments made on summary judgment, as if written discovery and depositions had been completed.   It must not be forgotten or ignored that this matter is only at a pleading stage without any discovery afforded to Mr. Franck whatsoever.  Plaintiffs further rely heavily on LLC operating agreements that are outside the scope of pleadings.  As described in the Counterclaims and reiterated herein, Mr. Datwyler was charged with creating and maintaining those documents. Not only has Mr. Franck not been allowed an opportunity to obtain and review such documents via the discovery process in this litigation, Mr. Datwyler never made them available to Mr. Franck prior to this litigation. Mr. Franck trusted that Mr. Datwyler, as his friend and mentor, was operating in good faith and did not question the lack of access to those documents, believing Mr. Datwyler completed his promised and agreed-upon obligations.

Mr. Franck must be afforded full opportunity to conduct discovery before expecting to assert greater detail on exactly how much profit these entities may have to distribute to him. Further and regardless, Mr. Franck has specifically asserted that Mr. Datwyler promised, represented and assured that their business ventures were known to be profitable enough to pay Mr. Franck at least $200,000 per year, and those exact pleaded assurances are what led Mr. Franck to quit his existing job and join Mr. Datwyler.   While the specifics of the exact and actual profit levels of the businesses are unknown by Mr. Franck and understandably missing from the Counterclaims based upon lack of specific knowledge, this is commonplace at the outset of a lawsuit being brought in

19

the position of someone like Mr. Franck.  The information provided is sufficient to give Plaintiffs fair notice of what is claimed and the grounds upon which those claims rest. The Court is tasked with using common sense to determine whether Mr. Franck has given adequate notice pleading of facts to support a *plausible claim* and has told a story that holds together, rather than attempting to ascertain whether or not Mr. Franck has proven every minute point of his claim with detailed evidence at the pleading stage.

IV.   **MR. FRANCK APPROPRIATELY STATES A COUNTERCLAIM FOR UNJUST ENRICHMENT AGAINST PLAINTIFFS UNDER COUNTERCLAIM II AND THIRD-PARTY CLAIM II.**

The facts as alleged in the Counterclaims lay out all the elements necessary to prove that the Plaintiff entities and their owner, Mr. Datwyler, were unjustly enriched to Mr. Franck's detriment.  To recover on a claim for unjust enrichment, three elements must be proven: (1) a benefit conferred upon the defendant by the plaintiff; (2) an appreciation or knowledge by the defendant of the benefit; and (3) the acceptance or retention by the defendant of the benefit under circumstances that makes its retention inequitable.  *See Tri-State Mechanical, Inc. v. Northland Coll.,* 2004 WI App 100, ¶14, 273 Wis. 2d 471, 681 N.W.2d 302.

Plaintiffs do not appear to argue whether a benefit was conferred by Mr. Franck on the Plaintiffs, nor that Plaintiffs were unaware of the benefits conferred.  Instead, Plaintiffs focus on whether their retention of the profits was inequitable.

Plaintiffs argue that Mr. Franck's sole allegation for the source of his compensation was from profit distributions based on the "membership" interests he was to receive in exchange for his efforts.  Plaintiffs further argue that, due to the rights of limited liability companies to use profits to further grow business, Mr. Franck had no expectation that his efforts would result in his receipt of any benefit.  First, that ignores the promises Mr. Datwyler made to Mr. Franck regarding

the $2,000 per month that Mr. Franck would receive until the businesses became profitable enough to deliver the $200,000 per year as promised by Mr. Datwyler. Second, that argument ignores the fact that Mr. Datwyler promised Mr. Franck that his ownership interest would produce $200,000 per year from profit sharing alone creating an obligation for profits to be distributed and not retained at least until that threshold was met. Third, that ignores the value of the ownership interests themselves, which were denied Mr. Franck when Mr. Datwyler refused or failed to fulfil his obligations to ensure Mr. Franck received the various ownership interests promised.

Plaintiffs appear to claim that the shared businesses were profitable and that those profits were retained by the companies for growth. The struggle, once again at this early stage in these proceedings, is that Mr. Franck was denied access to the financial information for the businesses during his time working with the Plaintiffs (Counterclaim ¶¶ 30, 50 & 51) and has not been allowed an opportunity for discovery in this matter to determine whether: (a) profits were retained, (b) profits were distributed without Mr. Franck receiving his share, or (c) profits were otherwise misused. Mr. Franck must be afforded full opportunity to conduct discovery before expecting to argue allegations on exactly how much profit these entities may have failed to pay out. Regardless, Mr. Datwyler committed to paying Mr. Franck $2,000 per month until the businesses distributed profits.

Mr. Datwyler promised to pay Mr. Franck $2,000 per month until profits from their shared businesses were consistently distributed to reach the $200,000.00 per year Mr. Datwyler promised Mr. Franck would earn from his efforts building those businesses. (Counterclaim ¶¶ 16, 27 & 32.) In late August 2023, Mr. Franck dared to push the issue with Mr. Datwyler of the financial well-being of the businesses they shared, which resulted in Mr. Datwyler cutting Mr. Franck out of all their shared businesses the next day. After cutting him out of their businesses, despite Mr. Franck

not receiving the $200,000 per year from profit distributions, Mr. Datwyler refused or failed to pay Mr. Franck the promised $2,000 per month.  That $2,000 per month is the minimum amount of benefit retained by Plaintiffs and is owed even assuming the businesses were not profitable.

Contrary to Plaintiffs' claims that "Mr. Franck does not plausibly allege he is entitled to any specific amount of profits from any LLC," when Mr. Datwyler promised Mr. Franck that Mr. Franck's ownership interest would equate to a minimum $200,000 per year, he committed to ensuring that profits in, at least, that amount would be distributed before the company retained anything for growth.  The Plaintiff businesses retaining profits for growth instead of paying profits out to Mr. Franck per the promise of their majority owner, Mr. Datwyler, is a benefit retained by Plaintiffs that, in equity, should be paid Mr. Franck. Furthermore, and regardless, Mr. Franck is not obligated to plead his exact monetary damages with specificity on his routine state common law claims at issue in his Counterclaims.

Plaintiffs stray far beyond the alleged Counterclaims by attempting to assert and suggest that the businesses had no profits and/or that all profits were re-invested into the businesses at Mr. Datwyler's behest. Those matters are beyond the bounds of what the Plaintiffs are permitted to assert and rely upon in their Motion, but even assuming, arguendo, that could be the situation, then such retention would undoubtedly increase the value of the companies. To the extent the value of those companies was increased, again Mr. Datwyler and the Plaintiffs have been unjustly enriched to the detriment of Mr. Franck. When Plaintiffs refused or failed to confer Mr. Franck's rightful ownership interest in those companies, they retained that benefit.  Without Mr. Franck's ownership interest being cut from the "ownership pie," either the other owners, such as Mr. Datwyler, or the Plaintiff businesses themselves received larger than appropriate pieces. No matter how you cut it,

the value of the businesses, and ownership interests in the same, increased due to Mr. Frank's efforts and he is left without even a crumb of value.

## V.  MR. FRANCK PLEADED PROPER CLAIMS FOR PROMISSORY ESTOPPEL AGAINST MR. DATWYLER UNDER THIRD-PARTY CLAIMS III, IV AND V.

The Wisconsin Supreme Court, when first recognizing promissory estoppel, denotes the elements as: "(1) was the promise one which the promisor should reasonably expect to induce action or forbearance of a definite and substantial character on the part of the promisee? (2) Did the promise induce such action or forbearance? (3) Can injustice be avoided only by enforcement of the promise?"  *Hoffman v. Red Owl Stores, Inc.* 26 Wis. 2d 683, 698, 133 N.W.2d 267, 275 (1965).    The doctrine of promissory estoppel does not require that promise giving rise to cause of action must be so comprehensive as to meet the requirements of an offer that would ripen into a contract if accepted by promisee. *Hoffman v. Red Owl Stores, Inc*., 26 Wis.2d 683, 133 N.W.2d 267 (1965). As a notable aside, given the equitable nature of promissory estoppel and its goal of fairness and justice to the promisee, Wisconsin courts have long recognized a rule that equity bars a defendant from invoking the statute of frauds to defeat a promissory estoppel claim. *U.S. Oil Co., Inc. v. Midwest Auto Care Services, Inc*., 150 Wis.2d 80, 440 N.W.2d 825 (App. 1989) ("Consequently, we conclude that the statute of frauds cannot be used to bar a claim for promissory estoppel.").

Mr. Datwyler does not argue that the first two elements of promissory estoppel were not pled.  Instead, Mr. Datwyler relies on irrelevant, non-precedential, and incorrectly decided cases, along with misconstruing cases, to argue that Mr. Franck has not pled damages.

Mr. Datwyler argues that damages are limited to reliance damages. For support, Mr. Datwyler relies on the Seventh Circuit case of *Werner v. Xerox Corp.*, 732 F.2d 580, 584 (7th Cir. 1984). However, the Seventh Circuit later recognized that *Werner* was incorrect in *Cosgrove v.*

23

*Bartolotta*, 150 F.3d 729, (7th Cir. 1998), stating: "This assumes you can get an award of expectation damages on a claim of promissory estoppel in Wisconsin, and apparently you can, although we said you couldn't in [*Werner*]." (internal citation omitted). Mr. Datwyler also cites to the unpublished, non-precedential case of *Noah's Ark of the Dells, Inc. v. Eagan Enters., Inc.*, No. 90-0598, 162 Wis.2d, 471 N.W.2d 317 (Wis. Ct. App. April 25, 1991). Beyond being unpublished and non-precedential, the issue in *Noah's Ark*, was whether there had been reliance, not the measure of damages for promissory estoppel.  The third case Mr. Datwyler cites suffers from the same deficiency as *Noah's Ark*.  The issue in *Knauf Realty, LLC v. Prudential Real Estate Affiliates, Inc.*, 486 F. Supp. 2d 855, (W.D. Wis. 2007), was whether an actionable promise had been made and whether there was reasonable reliance, not the measure of damages.  Indeed, this is evident in the language quoted in Mr. Datwyler's parenthetical on the case: "Promissory estoppel is an equitable or quasi-equitable common law doctrine intended to protect parties that have not entered into a contract but none the less incurred damages acting in reliance on the promises made by the other party."  This sentence means that the plaintiff must have relied on a promise and been damaged because of that reliance. It is not a description of the damages available.[2]  Essentially, Mr. Datwyler has provided no legitimate legal support for his argument that promissory estoppel damages are limited to reliance damages.

Further, the Wisconsin Supreme Court, in the *Red Owl* case, held that damages could be measured by "plaintiff's expenditures or change of position in reliance as well as the value to him of the promised performance" or specific performance of the promise.  *Red Owl*, 26 Wis.2d at 701-02, 133 N.W.2d at 276-77. The possible damages for promissory estoppel are exceedingly broad

---

[2] Mr. Datwyler's cite to *In re Abott Labs. Preterm Infact Nutrition Prods. Liab. Lit.*,MDL No. 3026, No. 22 C 3737 2023 WL 456592 (N. D. Ill. July 17, 2023), also provides no support for his proposition that a court should dismiss a claim when there are not the correct type of damages claimed because the case is an Illinois district court case that has no precedential value in this district and relies upon North Carolina law.

and meant to focus on preventing injustice, as quoted by the Court: "In determining what justice requires, the court must remember all of its powers, derived from equity, law merchant, and other sources, as well as common law.  Its decree should be molded accordingly." *Id.,* 26 Wis.2d at 702, 133 N.W.2d at 277.

As is evident, Mr. Datwyler's attempt to severely limit damages for promissory estoppel is not the law and it not supported by the cases Mr. Datwyler cites. Accordingly, the Court should not dismiss Mr. Franck's promissory estoppel claims.

## VI.   MR. FRANCK STATES PROPER CLAIMS FOR BREACH OF CONTRACT AGAINST MR. DATWYLER CONCERNING HIS INTERESTS IN AND RIGHTS TO THE PROFITS FROM THE FREE USA, THE EAGLE NEWS NETWORK AND 44 NORTH UNDER THIRD-PARTY CLAIM VI, VII, VIII and IX.

Mr. Franck has adequately pleaded facts that establish a breach of contract claim against Mr. Datwyler in relation to ownership interests in and profits from The Free USA and Eagle News Network.  Mr. Datwyler struck four deals: (1) that Mr. Franck would be a 25% owner of The Free USA if and as long as Mr. Swarts remained involved, (2) that upon Mr. Swarts leaving or being removed from The Free USA, then Mr. Franck would be a 50% owner, (3) that Mr. Datwyler and Mr. Franck would form and operate The Eagle on a 50/50 basis, and (4) that Mr. Franck would be a 25% owner of 44 North.  Mr. Franck will address these issues collectively.

First, again Plaintiffs extensively attempt to rely upon extrinsic evidence of LLC agreements that are not part of Mr. Franck's pleading. That is not permissible and cannot be condoned. Any arguments based upon those extrinsic documents must be disregarded.

Second, regardless of the documents, Mr. Franck asserts that very specific offers were made by Mr. Datwyler and accepted by Mr. Franck in relation to ownership in these business entities. The fact of whether or not Mr. Datwyler properly performed these contractual agreements by actually adding Mr. Franck's name to the LLC paperwork is a distinct issue that essentially goes

to the lack of performance of the agreed-upon terms by Mr. Datwyler, despite the fact that Mr. Franck performed his end of the bargain by diligently working on behalf of the entities.  In other words, whether Mr. Franck's name appears on the LLC documentation is irrelevant because the agreement was that Mr. Datwyler would add and include Mr. Franck's name into the ownership structure of those entities. The absence of Mr. Franck's name, even if that turns out to be the result of discovery, is that such evidence is proof of breach and proof of the failure of performance of their agreement on the part of Mr. Datwyler.

These agreements are not barred by the statute of frauds as suggested – at least at this stage of the case. Discovery is necessary before any statute of fraud issues can be ruled upon. For example, it is unclear at this stage whether there may be sufficient emails, text messages or other documentary evidence to demonstrate in writing the existence of a written contract. See, e.g. *Bunbury v. Krauss*, 41 Wis.2d 522, 5354 164 N.W.2d 473 (1969) (series of related documents can be combined together to constitute a sufficient memorandum in writing of an agreement and can be evidenced at different points in time, in order to satisfy the statute of frauds).  Further, partial performance of a contract, as exists here, can also take and place an agreement outside of the statute of frauds.  *Id.* (partial performance of a contract otherwise within the statute of frauds can be enforced for the prevention of fraud or injustice against the party who has changed their position to their detriment in reliance on the contract); *see also Toulon v. Nagle*, 67 Wis.2d 233, 248, 226 N.W.2d 480, 488 (1975) (oral contract in relation to business ownership and entitlement to stock enforced under partial performance rules).  The partial performance doctrine requires that there be such conduct on the part of the parties in performance of the oral contract that to hold it invalid as violating the statute of frauds would itself work a fraud or hardship. *See Toulon*, 67 Wis.2d at 248, 226 N.W.2d at 488. From Mr. Franck's pleadings, on their face and by inference, it is clear that he

relied to his detriment upon the agreements made with Mr. Datwyler about ownership interests in The Free USA, Eagle News, and 44 North, and indeed performed his portion of the agreement to become actively involved in the businesses.  At a minimum, the pled claims are adequate on their face, and discovery is necessary on issues of potential existence of sufficient writings and/or part performance to satisfy the statute of frauds. The Plaintiffs' motion in this regard should be denied.

## VII.   MR. FRANCK RIGHTLY STATES A WELL-PLEADED CLAIM FOR INTENTIONAL MISREPRESENTATION AGAINST MR. DATWYLER UNDER THIRD-PARTY CLAIM X

Mr. Datwyler first argues that the intentional misrepresentation claim was not pled with the requisite particularity under Federal Rule of Civil Procedure 9(b), claiming that failure to plead the who, what, when and where of the fraud requires dismissal. However, the Seventh Circuit has stated that "because courts and litigants often erroneously take an overly rigid view of the formulation, we have also observed that the requisite information … may vary on the facts of the given case." *Pirelli Armstrong Tire Corp. Retiree Medical Benefits Tr. v. Walgreen Co.*, 631 F.3d 436, 441-42 (7th Cir. 2011). The court went on to state that the "adoption of the Federal Rules of Civil Procedure constituted a self-conscious departure from prior pleading regimes that emphasized form for form's sake" and cites to Moore's Federal Practice for the proposition that "plaintiffs are not absolutely required to plead the specific date, place, or time of the fraudulent acts." *Id.* at 442. Accordingly, Mr. Franck is not strictly required to plead the who, what, when and where of the fraud.

To argue that Mr. Franck does not meet the heightened pleading standard, Mr. Datwyler looks only to one paragraph of Claim X, paragraph 128, and *ignores the fact section of Mr. Franck's counterclaim pleading*. If Mr. Datwyler were to look at the fact section of Mr. Franck's claims, he would see that the facts required to be pled for an intentional misrepresentation claim are contained

therein. For example, paragraph 14 states that Mr. Datwyler (the who), on August 25, 2021 (the when), represented that Mr. Franck would earn a minimum of $200,000 per year (the what) by virtue of joining Mr. Datwyler's business ventures. The remainder of the detailed factual allegations contained in the fact section provide more than enough information to meet the requirement that Mr. Franck plead his intentional misrepresentation claim with particularity. (*See* Counterclaims ¶¶ 16, 25, 27, and 28.)

Mr. Datwyler asserts that the intentional misrepresentation claim asserted in Claim X must fail because fraudulent misrepresentation only relates to present or existing facts and cannot relate to future promises.  This is a misstatement of Wisconsin law. A promise related to something that will happen in the future is actionable if the defrauding party had no intention of performing on its promise. *Hartwig v. Bitter*, 29 Wis.2d 653, 657, 139 N.W.2d 644, 647 (1966); *Anderson v. Tri-State Home Improvement Co.*, 268 Wis. 455, 462-63, 67 N.W.2d 853, 858 (1955).  This is exactly what has happened here.  Contrary, to Mr. Datwyler's assertion, the representation is not that the businesses would have profits of $2,000,000, the misrepresentation is that Mr. Datwyler was obviously familiar and knowledgeable of his own existing business plans, and that such business venture would be capable of paying an income to Mr. Franck of $200,000 per year, if profitable, and that Mr. Franck would receive a profit share from the business. As Mr. Franck later found out, the businesses were profitable, but he did not receive a profit share, and indeed was promptly terminated from the businesses by Mr. Datwyler when Mr. Franck confronted him about the issue. This illustrates that Mr. Datwyler did not have any intention of performing on his promise to provide Mr. Franck with a share of the profits of the businesses. Accordingly, Mr. Franck has stated a viable intentional misrepresentation claim and Claim X should not be dismissed.

**VIII.   MR. FRANCK STATES AN ADEQUATE CLAIM FOR BREACH OF FIDUCIARY DUTY AGAINST THIRD-PARTY DEFENDANT UNDER THIRD-PARTY CLAIM XI.**

The elements of a claim for breach of a fiduciary duty are: (1) the defendant owes a fiduciary duty to the plaintiff, (2) the defendant breached that duty, and (3) the defendant's breach of the duty caused the plaintiff's damages. *Berner Cheese Corp. v. Krug*, 2008 WI 95, ¶ 40, 312 Wis.2d 251, 752 N.W.2d 800. The existence of a duty is typically a question of law. *Stephenson v. Universal Metrics, Inc.*, 2002 WI 30, ¶ 15, 251 Wis.2d 171, 641 N.W.2d 158. Whether a duty has been breached is a mixed question of law and fact. *Jorgensen v. Water Works, Inc*., 2001 WI App 135, ¶ 8, 246 Wis.2d 614, 630 N.W.2d 230.

Without a doubt, co-owners of a member-managed LLC is a classic scenario for the existence of a fiduciary duty, particularly as to a controlling owner's actions in relation to minority owners, and Mr. Franck has standing to pursue such claims as the injured member. *See, e.g. Marx v. Morris*, 386 Wis.2d 122, 925 N.W.2d 112, 150 (2019).  Further, the Wisconsin Supreme Court has held that the Wisconsin LLC act does not displace and preclude common law fiduciary duty claims.  *Id.* at 151-52 ("In this case, the claims asserted by Marx and Murray, breach of fiduciary duty, unjust enrichment and breach of the covenant of good faith and fair dealing, are not displaced by ch. 183 based on the record before us.")

By virtue of Plaintiffs' own arguments on the issue of fiduciary duties that may be owed, it is clear that the existence of and breach of fiduciary duties can be a very fact specific inquiry that needs to be fleshed out in discovery.  Plaintiffs assert that some entities may be subject to Wisconsin law, while purportedly others are subject to Puerto Rican law.  What is clear from Mr. Francks' pleading is that he asserts to be a co-owner in multiple business entities with Mr. Datwyler, that he placed his trust in Mr. Datwyler in relation to the businesses, and that ultimately

Mr. Datwyler failed to treat Mr. Franck with honesty and loyalty, instead engaging in self-serving and self-dealing, to Mr. Franck's detriment.  These facts smack of breach of fiduciary duty vis-à-vis co-owners of multiple business entities. This counterclaim is not ripe for summary dismissal for failure to state a claim, but instead should be permitted to proceed into the routine phases of discovery.

## **CONCLUSION**

For the foregoing reasons, Mr. Franck respectfully requests that the Court deny Plaintiffs' Motion to Dismiss the Amended Counterclaims and Third-Party Claims.


Dated:   February 16, 2024                    By:   */s/ Kristopher J. Krentz*
                                                      Kristopher J. Krentz, Esq. (0308195)
                                                      Krentz Law
                                                      P.O. Box 865
                                                      Osceola, WI 54020
                                                      (952) 905-3291
                                                      Kris@Krentzlaw.com

                                                      Kevin S. Sandstrom (1082447)
                                                      Eckberg Lammers, P.C.
                                                      1809 Northwestern Avenue
                                                      Stillwater, MN 55082
                                                      (651) 439-2878
                                                      KSandstrom@eckberglammers.com

                                                      ***Attorneys for Defendant, Counterclaim Plaintiff, and Third-Party Plaintiff***